UNITED STATES v. NEW YORK, O. & W. RY. CO.

(District Court, N. D. New York. September 11, 1914.)

1. MASTER AND SERVANT (§ 13*)—INTERSTATE COMMERCE—HOURS OF SERVICE LAW—"CASUALTY"—SICKNESS.

The word "casualty," as used in Hours of Service Law (Act March 4, 1907, c. 2939) §§ 2, 3, 34 Stat. 1416 (U. S. Comp. St. Supp. 1909, pp. 1170, 1171), means a happening or coming to pass without apparent cause, without design on the part of the agent, in an unaccountable manner, or as a mere coincidence or accident, coming by chance, accidental, fortuitous, indeterminate, etc., that which happens by chance, accident, or contingency, and hence included sudden illness of a train dispatcher, requiring defendant railroad company to work a copy operator in the dispatcher's office as a dispatcher for a longer period than 9 hours in a 24-hour period, which therefore did not constitute a violation of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, First and Second Series, Casualty.]

2. MASTER AND SERVANT (§ 13*) — HOURS OF SERVICE LAW — TRAIN DISPATCHERS—OVERTIME—"UNAVOIDABLE CASUALTY"—DEATH IN FAMILY.

Where a train dispatcher was compelled to be off duty because of the sudden and unexpected death of his mother, who was a member of his household, and the railroad company was required to work a copy operator as a dispatcher for a longer period than 9 hours in 24, had a sufficient number of employés for all ordinary contingencies, such facts constituted an "unavoidable casualty," within the exception of Hours of Service Law (Act March 4, 1907, c. 2939) §§ 2, 3, 34 Stat. 1416 (U. S. Comp. St. Supp. 1909, pp. 1170, 1171).

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*

For other definitions, see Words and Phrases, First and Second Series, Unavoidable Casualty.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. MASTER AND SERVANT (§ 13\*) — PERIOD OF SERVICE — HOURS OF SERVICE LAW—TRAIN DISPATCHERS.**

Hours of Service Law (Act March 4, 1907, c. 2939) §§ 2, 3, 34 Stat. 1416 (U. S. Comp. St. Supp. 1909, pp. 1170, 1171), provides that no operator, train dispatcher, or other employé, who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements, shall be required or permitted to be or remain on duty for a longer period than 9 hours in any 24-hour period in all towers continuously operated night and day, except in cases of emergency, when the employés may be permitted to remain on duty for 4 additional hours on not exceeding 3 days in any week. *Held*, that where, by reason of the disability of a train dispatcher, a copy operator, whose ordinary business did not involve the use of the telegraph for the transmission of train orders, except in emergencies, was required to remain on duty for a longer period than 9 hours in 24, and for a portion of such time was required to transmit train orders, the fact that he was not required to transmit such orders during a period longer than 8 hours did not exempt him from the application of Hours of Service Law (Act March 4, 1907, c. 2939) §§ 2, 3, 34 Stat. 1416 (U. S. Comp. St. Supp. 1909, pp. 1170, 1171).

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.\*]

Action for penalties by the United States against the New York, Ontario & Western Railway Company. Judgment for defendant.

Thos. H. Dowd, of Cortland, N. Y., Asst. U. S. Atty.
C. L. Andrus, of Stamford, N. Y., for defendant.

RAY, District Judge. The defendant, the New York, Ontario & Western Railway Company, operates a railroad from Weehawken, N. J., to Oswego, N. Y., with a division headquarters at the city of Norwich, N. Y., where at the time in question it employed train dispatchers and also assistants, or copy operators, so called, both day and night. It was the duty of these copy operators to copy the records of the movements of trains and act generally in a clerical capacity for the dispatcher, but two of them were in fact competent in emergencies to act as dispatcher. However, it was no part of the duty of either of them, when or while acting as copy operator, to direct or control the movement of trains.

On November 14, 1912, and July 22, 1913, and at all intermediate dates, the defendant had three regular train dispatchers in its employ at the Norwich office, and also three assistants or copy operators. The hours of service of these dispatchers, or "tricks," as they are called, at the times in question, were as follows: Dispatcher Marshall, from 7 a. m. to 3 p. m.; Dispatcher Doody, from 3 p. m. to 11 p. m.; Dispatcher Brookins, from 11 p. m. to 7 a. m. On the dates in question one Towner was copy operator, and his trick, or hours of service, was from 8 a. m. to 4 p. m. At midnight on each of the occasions in question he had been off duty 8 hours.

In the evening of November 14, 1912, the mother of Dispatcher Brookins, and who was a member of his household, died suddenly and unexpectedly. In consequence of such death Brookins, who was to go on duty and relieve Doody at 11 p. m. reported his inability to do so.

In this emergency the superintendent in charge of this division and at this Norwich office continued Dispatcher Doody on duty until midnight, when he called Copy Operator Towner, who had had 8 hours' rest, to relieve him. This Towner did, and he served as dispatcher until 7 a. m., when Marshall came on duty. Towner was the only available man for the purpose at the time.

On the evening of July 22, 1913, Dispatcher Brookins, whose hours of duty commenced at 11 p. m., was taken ill, suddenly and unexpectedly, and, as his illness continued and increased, he was unable to report for duty, and thereupon in this emergency the superintendent continued Dispatcher Doody on duty until 12 o'clock midnight, as before, when Copy Operator Towner, the only available man, and who had been off duty since 4 o'clock p. m., was called to relieve Doody, which he did. Towner served as dispatcher until 7 a. m., when he was relieved by Marshall as before.

So far as disclosed by the evidence, there had been no previous time when these dispatchers and their copy operators had not been able to properly fill and fully perform the duties of their positions without the necessity of overtime work. During all of this time the defendant had in its employ at this office, or within call, operators qualified to take the place of copy operators who should be called upon to discharge the duties of dispatchers. Upon neither of the occasions aforesaid did Operator Towner act as an operator, train dispatcher, or other employé, who by the use of the telephone and telegraph dispatches reported, transmitted, received, or delivered orders pertaining to or affecting train movements, for a longer period than 9 hours in the 24-hour period; but upon each occasion such operator reported, transmitted, received, or delivered orders pertaining to or affecting train movements only from 12 o'clock midnight until 7 o'clock a. m.

[1] In view of these undisputed facts, the defendant insists that the requirement of Copy Operator Towner that he remain on duty, working as dispatcher part of the time, as stated, on both occasions, was because of a casualty, or act of God, and that the provisions of the federal Hours of Service Act prohibiting employment for more than 9 hours in the 24-hour period does not apply. After providing for the time beyond which in any 24 hours the operator cannot be employed without incurring the prescribed penalty, the act provides as follows:

"Provided that the provisions of this act shall not apply in case of casualty, or unavoidable accident, or the act of God."

As to the transaction of July 22, 1913, the sudden and unexpected sickness of Brookins absolutely disabled him. It was not an accident, within the commonly accepted definition of the word. Was it a casualty? Brookins was a part of the railroad itself, in that he was one of its employés engaged in the running and operation of its trains. Without Brookins and others like him the road could not operate, and hence, when he broke down suddenly and unexpectedly, the railroad itself, through its operating forces, was acted upon. If Brookins, *on his way* to take his trick, had been run over by an automobile and killed or seriously injured, without fault on his part, so as to disable him, there would have occurred, not only an accident (unavoidable so far as he

and the defendant railroad were concerned), but a casualty.  In my judgment in such a case the provisions of the act would not apply. "Casual," according to the Century Dictionary, means:

"Happening or coming to pass without apparent cause, without design on the part of the agent, in an unaccountable manner, or as a mere coincidence or accident; coming by chance; accidental; fortuitous; indeterminate; as a casual encounter."

And "a casual" is one who is admitted into a hospital or a workhouse at irregular and uncertain periods, or because of some accident. "Casualty" is defined by the same authority as:

"Chance, or what happens by chance; accident; contingency.  (2) An unfortunate chance or accident, especially one resulting in bodily injury or death. Specifically, disability or loss of life in battle or military service from wounds," etc.

Here, as to July 22, 1913, Brookins without fault, at home, resting, and preparing to take his trick at 11 p. m., was taken sick without fault on his part and disabled.  It was unforeseen, and unexpected, and unusual.  It happened and began to be without design.  It was a fortuitous event.  If this sickness was the result of some act of Brookins, as overeating, or eating impure food, or exposure, it was an event happening without the concurrence of his will, or that of the cook or any other person.  The Century Dictionary says:

"Accident.  In general, anything that happens or begins to be without design, or as an unforeseen effect; that which falls out by chance; a fortuitous event or circumstance.  (2) Specifically, an undesirable or unfortunate happening; an undesigned harm or injury; a casualty or mishap.  In legal use, an accident is (a) an event happening without the concurrence of the will of the person by whose agency it was caused."

Sudden illness has been stated to be an act of God.  Gleeson v. Virginia Midland Railroad Co., 140 U. S. 435–439, 11 Sup. Ct. 859, 861, 35 L. Ed. 458.  It was not so decided as the precise point was not involved; but the opinion of the court by Mr. Justice Lamar said with evident approval:

"Extraordinary floods, storms of unusual violence, sudden tempests, severe frosts, great droughts, lightnings, earthquakes, *sudden deaths and illnesses,* have been held to be 'acts of God.'"

In Fish v. Chapman, 2 Ga. 349, 46 Am. Dec. 393, it was held that:

"An unavoidable accident is synonymous with inevitable, and means any accident produced by physical causes which are irresistible, such as lightning, storms, perils of the sea, earthquakes, inundations, sudden death, or illness."

In The Majestic, 166 U. S. 375, 386, 17 Sup. Ct. 597, 41 L. Ed. 1039, it was said that the "act of God" which would exempt one from liability is an act in which no man has any agency whatever.  In Bullock v. White Star Steamship Co., 30 Wash. 448, 70 Pac. 1106, it was held that an "act of God" such as would relieve from the performance of a contract must be such as a person of reasonable prudence and foresight could not have guarded against.  In the case of lightnings, storms, earthquakes, and inundations, no man has any agency whatever so far as their occurrence is concerned.  In the case of illnesses, or even death it may be brought on by the willful act or willfully negligent act or acts

of the sufferer, or it may not be. In the case of death it might be suicide, and in the case of sickness it might result from an attempt to commit suicide. Here there is no claim, pretense, or suggestion that Brookins willfully or intentionally brought on his sudden sickness, or was guilty of any act of commission or omission which did, and I think the transaction of July 22, 1913, is within the proviso that:

"The provisions of this act shall not apply in case of casualty, or unavoidable accident, or the act of God."

[2] The other transaction, the sudden and unexpected death of the mother of Brookins, who was living with him in his own household, and which death occurred in the evening of November 14, 1912, and which caused Brookins to remain away, and made it necessary to put Towner on his trick, presents a different question in this: The death of Mrs. Brookins, the mother of Brookins, the dispatcher, did not *directly* act or operate on or directly affect the defendant railroad company, and Brookins himself was not made physically ill or sick, so he could not have reported for duty and undertaken to guide and control the movement of trains by means of the telegraph lines. Assuming, as we must, that he loved his mother, for whom he was caring in his own household and family, the shock of her sudden and unexpected death would more or less shock and unnerve him, or any son under similar circumstances. Thus unnerved, he would be more or less incapacitated from properly performing the duties of a train dispatcher. The death of the mother was either a casualty, an unavoidable accident, or the act of God; but it did not operate or act upon the railroad company, or its employé, or interfere with either, except in the indirect manner referred to. The language of the act (Act March 4, 1907, c. 2939, §§ 2, 3, 34 Stat. 1416 [U. S. Comp. St. Supp. 1909, pp. 1170, 1171]):

"Provided, that no operator, train dispatcher, or other employé, who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements, shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week"

—must be reasonably construed to effect the purpose of its enactment. If we read the words, "shall not apply in *any* case of casualty or unavoidable accident or the act of God," as applicable whenever there is *a sudden death* in the household of the railroad employé (that of a relative, of course), the transaction of November 14, 1912, is within the proviso of the act, and the provisions of the act have no application whatever, and the complaint must be dismissed.

It must be conceded that the main purpose of the section quoted— that part relating to train operators, who direct and control the movement of trains by telephone or telegraph—was to secure the presence of operators who are not overworked, tired out, sleepy, dull for want of sleep, etc., and thus secure, so far as such precautions can, the safety of the traveling public. It was not the purpose to compel a railroad

company to put a train dispatcher in its employ on duty in case when, because of casualty, or unavoidable accident, or the act of God, such employé had been made, recently, of course, incompetent to, properly perform his duties, but rather in such a case to allow the railroad company to keep other employés on duty overtime. It was not the intention of Congress to jump either the railroad company or the traveling public from "the frying pan into the fire." It would be and is the duty of a railroad corporation to have a reasonable number of employés in its employ, and to exercise reasonable and due care to that end, to secure the proper running of its trains, including the dispatching, of course, but not to meet and cover cases of casualty, unavoidable accidents, or the act of God. If, then, a casualty, or an unavoidable accident, or an act of God, occur and intervene, making it necessary to work an employé overtime, assuming the railroad company has done its duty in having in its employ a reasonable number of employés to take care of ordinary conditions, including mishaps and occurrences reasonably to be apprehended and liable to occur, and the employé is worked overtime, the act does not apply.

Is it necessary that the casualty should have been of a physical nature operating directly on the employé? Or that the unavoidable accident should have been to the employé directly, so as to physically disable him, or that the act of God should have struck or operated directly on such employé? If a father, with a wife and child, as he is about to leave his house to take his trick as dispatcher, sees them or either of them stricken with sudden and severe illness, or death, is not that a case of casualty, or of an act of God, such as would make the act regulating hours of labor inapplicable in case the employer found it necessary to do as was done here? The father could go to the office of the company and take his trick, and neglect those at home; but the employer, if he knew the facts, would not permit, and the father's thoughts would be at home, and not on his work. The same is true, to an extent, when death strikes the father or mother, a member of the household. It is hard to draw the line, and somewhat dangerous to the strict enforcement of the law, perhaps, to hold that a casualty, or an unavoidable accident, or an act of God not operating *directly* on the employé or the employer, brings a case within the proviso of the act; but I think it the more just and reasonable to hold that it does, provided the employé by its operation is incapacitated from the proper performance of his duty, and the employer has done its duty in providing a reasonable number of employés for the duty. If the casualty, or accident, or act of God is such that it operates directly or indirectly on the employé performing a certain duty, and relied on by the employer to perform such duty, and thereby in fact incapacitates such employé from discharging that duty, and makes it necessary for the railroad company to tie up its trains or work a train dispatcher overtime, there being no negligence, it seems to me the Hours of Labor Act does not apply.

In this case there was no negligence on the part of the defendant railroad company. It had three regular dispatchers, and three assistants or copy dispatchers ready and competent to take their places, and at least two extra copy dispatchers able and competent to take the place

of two of the others, if they were called upon to act as dispatchers. It seems to me that it would be too onerous and unreasonable to require a railroad company, under the circumstances shown here, to keep in its employ and ready for duty a greater force of dispatchers and copy dispatchers and reserve copy dispatchers than this defendant had. No happenings or experience had shown defendant's force to be inadequate, and reasonable foresight could not have foreseen such a condition, which was unusual, not liable to happen, and which had not existed before.

[3] The defendant urges, in view of the language of the act (section 2), "that no operator, train dispatcher, or other employé, who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements, shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers * * * continuously operated night and day * * * except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours * * * on not exceeding three days in any week," that this action cannot be maintained in any event, as Towner's duties, except in emergencies such as this, did not call on him or require him to use the telegraph or telephone to dispatch, report, transmit, or receive, or deliver orders pertaining to or affecting train movements, and that he had not performed such duties prior to midnight that day, and that when called to act as dispatcher he remained on duty 8 hours only. The claim is that, until put on this work of dispatcher at 12 o'clock midnight, he did not come within the act at all, and that what he had been doing before is immaterial, inasmuch as he had not been engaged "by the use of the telegraph or telephone dispatches" in reporting, transmitting, receiving, or delivering orders pertaining to or affecting train movements, and that it had not been a part of his duty to do so.

It is contended that he was not within the description of section 2 until he assumed the duty of operator at midnight. I do not think this contention can be sustained. Towner was an employé of the defendant in this line of work, but he acted as copy operator only, and was to do so continuously unless called upon to take the place of the regular operator, whose duties he was qualified to perform in an emergency. He had been at work as copy operator for the 8 or 9 hours preceding 4 o'clock p. m., and he was then off 8 hours, and then he went on duty as regular operator or train dispatcher, and worked 8 hours, or until 7 a. m. I think Towner was within the reason and the spirit of the act. He could not within a given 24-hour period work 8 or 9 hours as copy operator, and later and within the same 24-hour period work 8 or 9 hours more as train dispatcher. The very object or purpose of the law would forbid this.

I think that on the other grounds stated the plaintiff has failed, and that defendant has established:

"1. That the requirement of Operator Towner to remain on duty for a longer period than 9 hours in the 24-hour period on November 14, 1912, was because of a casualty, or act of God, and the provisions of the federal Hours of Service Act prohibiting such employment did not apply.

"2. That the requirement of Operator Towner to remain on duty for a longer period than 9 hours in the 24-hour period on July 22, 1913, was because of a casualty, unavoidable accident, or act of God, and the provisions of the federal Hours of Service Act prohibiting such employment did not apply.

"3. That the defendant is entitled to judgment dismissing the complaint."

There will be a judgment accordingly.