## UNITED STATES v. ATLANTIC COAST LINE CO.

(District Court, E. D. North Carolina. June 30, 1915.)

1. MASTER AND SERVANT ⊛⇒13—HOURS OF SERVICE—STATUTORY PROVISIONS—"EMERGENCY"—"EXIGENCY."

Hours of Service Act March 4, 1907, c. 2939, § 2, 34 Stat. 1415 (Comp. St. 1913, § 8677), provides that it shall be unlawful for carriers to require or permit any employé subject thereto to remain on duty for more than 16 consecutive hours, provided that no operator, etc., who by telegraph or telephone dispatches, etc., orders affecting train movements, shall be permitted to remain on duty for more than 9 hours in any 24-hour period at places and stations continuously operated, except in case of emergency. Section 3 imposes a penalty for violations, but provides that the act shall not apply in any case of casualty, unvoidable accident, or the act of God. An operator working from 4 o'clock p. m. until midnight at a continuously operated office at K. was subpœnaed as a witness in an action tried on May 26th, and obtained permission from the chief dispatcher at R. to obey the subpœna, with the understanding that he would return to K. about 2:30 p. m. The case was not reached for trial until about 4 p. m., and about 1 p. m. the operator wired the dispatcher that he would be delayed, but the next train from R. to K. did not reach K. until 10 p. m. The operator reached K. about 7:30 p. m., but, when requested to return to duty, reported that he was sick. One of the other operators therefore worked from 8 a. m. until 8 p. m., and the other from 8 p. m. until 8 a. m. on the morning of the 27th. *Held*, that the excessive hours of the first of such operators was due to an emergency, and the carrier was not liable for the statutory penalty, as "emergency" is not synonymous with "accident," "casualty," or "act of God," but is synonymous with "exigency," and means something arising suddenly out of the current of events; any event or occasional combination of circumstances, calling for immediate action or remedy; a pressing necessity; a sudden and unexpected happening or an unforeseen occurrence or condition.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊛⇒13.

For other definitions, see Words and Phrases, First and Second Series, Emergency.]

2. MASTER AND SERVANT ⊛⇒13—HOURS OF SERVICE—STATUTORY PROVISIONS.

It not appearing that the chief dispatcher was not promptly notified that such operator was sick, and there being no suggestion that he did not have an extra operator at R. there was no emergency or casualty excusing the company's act in allowing the second operator to work three hours, on the morning of the 27th, more than the hours allowed by statute.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊛⇒13.]

3. MASTER AND SERVANT ⊛⇒13—HOURS OF SERVICE—STATUTE—LIBERAL OR STRICT CONSTRUCTION.

The Hours of Service Act is remedial in its purpose and scope and penal in its means of employment, and though courts frequently invoke the principle that doubtful language in a remedial statute should be construed liberally to suppress the evil and advance the remedy, while penal statutes should be construed strictly to narrow the scope of the penalty, the better rule is probably to give the entire statute a fair construction for the purpose of ascertaining the legislative mind, and giving effect to its purpose, and an unreasonable relaxation of the rule prescribed on the one hand, or a strained construction on the other, is unwarranted.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⊛⇒13.]

⊛⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. MASTER AND SERVANT ⬤⟿13—HOURS OF SERVICE ACT—EXCEPTIONS AND PROVISOS.

The provision of Hours of Service Act, § 2, as to cases of emergency with respect to the hours of service of telegraph operators, constitutes an exception and not a proviso.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⬤⟿13.]

5. MASTER AND SERVANT ⬤⟿13—HOURS OF SERVICE ACT—CONSTRUCTION—MEANING OF LANGUAGE.

It must be assumed that Congress in excepting cases of emergency from the provisions of the Hours of Service Act, § 2, as to the hours of service of telegraph operators, used the term "a case of emergency" in that sense, and with that meaning given it in general use.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⬤⟿13.]

6. STATUTES ⬤⟿181—CONSTRUCTION—HARSH OR OPPRESSIVE CONSTRUCTION.

While the courts will endeavor to ascertain and enforce the legislative will, they will not, by strained and forced construction of statutes, give them such effect as will render their enforcement harsh and oppressive.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 259, 263; Dec. Dig. ⬤⟿181.]

7. MASTER AND SERVANT ⬤⟿13—HOURS OF SERVICE—STATUTORY PROVISIONS.

Pell's Rev. N. C. 1908, § 1643, provides that every witness summoned as directed shall appear and continue to attend court until discharged and, in default thereof, shall pay in civil actions or special proceedings, to the party at whose instance the subpœna issued, $40, in addition to full damages sustained. *Held*, that where a railroad telegraph operator, subpœnaed as a witness, was detained in court longer than was expected resulting in other operators working more than nine hours, the railroad company's immunity from liability under the Hours of Service Act was not affected by the fact that such operator was so subpœnaed as a witness on behalf of the railroad company, as his attendance at court was at the command of the court and pertained to the administration of justice, and his duty to obey the subpœna did not arise from his contract relation with the company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. ⬤⟿13.]

8. EVIDENCE ⬤⟿10—JUDICIAL NOTICE—LOCATION OF PLACES.

Judicial notice may be taken that Kenly is about ten miles south of Smithfield on the main line of the Atlantic Coast Line Railroad.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 9–14; Dec. Dig. ⬤⟿10.]

9. EVIDENCE ⬤⟿40—JUDICIAL NOTICE—JURISDICTION AND PROCEDURE OF COURTS.

Judicial notice may be taken that the recorder's court at Smithfield, N. C., has a local and restricted jurisdiction, and usually tries and disposes of cases without the intervention of a jury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 54, 55; Dec. Dig. ⬤⟿ 40.]

Action by the United States against the Atlantic Coast Line Company, for recovery of penalties for alleged violation of Hours of Service Act. Judgment for plaintiff on the second count.

Francis D. Winston, U. S. Atty., of Windsor, N. C., and R. F. Walter, Sp. Asst. U. S. Atty., of Washington, D. C.

George B. Elliott, of Wilmington, N. C., and Harry Skinner, of Greenville, N. C., for defendant.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

224 F.—11

CONNOR, District Judge. [1, 2] Plaintiff declared, in two counts, alleging separate violations of Hours of Service Act (34 Stat. c. 2939). The cause was submitted upon an agreed statement of facts, of which those material to the decision of the case are: Defendant, an interstate common carrier, on and prior to May 25, 1914, maintained at Kenly, N. C., a telegraph office, operated, during the day and night, for the purpose of sending and receiving orders pertaining to or affecting train movements. It had, in its employment, on said day, and prior thereto, as operators in said office, "Operator F. W. Scott, working from 8 o'clock a. m. until 4 o'clock p. m; operator P. H. Ethridge, working from 4 o'clock p. m. until 12 o'clock midnight; operator B. T. Allsbrook, working from 12 o'clock midnight until 8 o'clock a. m.

On the 8th day of May, 1914, one J. W. Fitzgerald commenced an action against defendant Atlantic Coast Line Company, returnable before a justice of the peace, from whose judgment an appeal was taken triable before the recorder's court, at Smithfield, N. C., which court meets every Monday, and generally holds not to exceed half the day. Operator P. H. Ethridge, whose "trick" commenced at 4 o'clock p. m. and continued until midnight, was served with a subpoena on the evening of May 25, 1914, to appear as a witness for the defendant before said recorder's court, at Smithfield, N. C., at 9 o'clock a. m. on May 26, 1914. He obtained permission from defendant's chief dispatcher at Rocky Mount, N. C., to obey the subpoena, with the understanding, with said dispatcher, that he would return to Kenly, on defendant's train No. 80, which passed Smithfield at 2:10 p. m. and was scheduled to reach Kenly at 2:30 p. m. on May 26, 1914. Ethridge, on the morning of May 26th, arose at 4 o'clock and called five other witnesses for the defendant in the same case. Instead of going on the train which passed Kenly at 5:30 a. m., reaching Smithfield, N. C., at 6 o'clock a. m., he accepted the invitation of a friend to go by automobile, which resulted in his leaving Kenly at 7 o'clock a. m. and reaching Smithfield at 9 o'clock a. m. He remained in the court during the morning and until 1 o'clock p. m. The case of Fitzgerald v. A. C. L. R. R. Co. was not called for trial at the morning session. Ethridge walked three-quarters of a mile to the telegraph office, and wired to the chief dispatcher that the case would not be reached before evening and to look out for the "second trick." The case was tried about 4 o'clock p. m. and was dismissed. Ethridge returned by automobile to Kenly, reaching there at 7:30 p. m. and, by reason of being up since 4 o'clock a. m., was fatigued and reported that he was sick. This report was made to operator Scott, who went, at the instance of the chief dispatcher, to have Ethridge resume his "trick." At the time the chief dispatcher received the message from Ethridge from Smithfield, defendant's train No. 89 had left Rocky Mount, and the only other passenger train on which he could possibly have sent a substitute to take Ethridge's place was due to reach Kenly at 10:02 o'clock p. m. Defendant, on account of the condition created by the absence of Ethridge, required and permitted its operator F. W. Scott, to remain on duty from the hour of 8 o'clock a. m. until 8 o'clock p. m. on May 26, 1914, and its operator B. T. Allsbrook to remain on duty from the hour of 8 o'clock p. m., May 26th,

until 8 o'clock a. m., May 27th. Ethridge returned to duty at 4 o'clock p. m. May 27th.

Plaintiff demands judgment on each count for the penalty prescribed by section 3 of the act. Upon the facts agreed, the sole question presented is whether, in permitting the operators to remain on duty, continuously, for longer period than nine hours, it violated the prohibitory provisions of the statute. The answer to that question is dependent upon the construction to be given the words "except in case of emergency," because, in such case, the act permits the operator "to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week." This last period was not exceeded by either of the operators.

[3] In view of several of the contentions made by counsel, for the government, and several of the opinions in cases relied upon, it will be convenient to notice the peculiar language of the statute as it is related to other statutes which may be treated, for purposes of interpretation, as in pari materia. The statute is remedial in its purpose and scope and penal in its means of employment. While courts frequently invoke the principle, in the interpretation of remedial statutes, that doubtful language should be construed liberally to suppress the evil and advance the remedy, whereas penal statutes should be construed strictly to narrow the scope of the penalty, probably the better rule is to give to the entire statute a fair construction for the purpose of ascertaining the legislative mind and the giving effect to its purpose. United States v. Kan. City Sou. Ry. Co., 202 Fed. 828, 121 C. C. A. 136. The safety of employés and of the traveling public was the manifest and well-understood purpose of Congress in the enactment of the group of statutes, relating to the operation of railroad trains, passed during the past ten years. The reasons which moved the legislative mind and stimulated its action are well known and understood. The courts have uniformly so construed the terms of the statutes as to effectuate the purpose of their enactment. Replying to the suggestion that to enforce, rigidly, the requirements of the Safety Appliance Act (Act March 2, 1893, c. 196, 27 Stat. 531 [Comp. St. 1913, §§ 8605–8612]) imposed hardship upon the railroads, Mr. Justice Moody, in St. Louis & Iron Mountain R. R. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061, said:

"We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is described. * * * Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. * * * It is urged that this is a harsh construction. To this we reply that, if it be the true construction, its harshness is no concern of the courts. * *. * Certainly the statute ought not to be given an absurd or utterly unreasonable interpretation, leading to hardship and injustice, if any other interpretation is reasonably possible."

This language was approved by the court in C., B. & Q. Ry. v. U. S., 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582 and may now be regarded as the settled rule of construction of this statute.

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of this

character. 'The reason of the law in such cases should prevail over its letter." United States v. Kirby, 7 Wall. 482, 19 L. Ed. 278.

When the measure of duty is prescribed and the rule commanded to be observe.', or the conduct prohibited, is clear and absolute, the court will enforce the duty by enforcing the remedy prescribed by the Legislature. Atlantic R. R. Co. v. United States, 168 Fed. 175, 94 C. C. A. 35, and numerous other cases.

It will be observed, however, that the provisions of the statute under consideration in these cases are free from obscurity and contain no dispensing clause. In the Hours of Service Act, for manifest reasons, Congress deemed it essential for the enforcement of one of the purposes in view (the safety of the traveling public) to make provision for conditions which experience taught that, notwithstanding the highest possible degree of foresight, would sometimes arise. In the Safety Appliance Act, the kind, character, size, and adjustment of appliances generally understood and not difficult to be provided by the railroad companies were prescribed. When, however, Congress came to deal with the question of continuous service of employés, the human element, with its well-understood limitations and contingencies, it was found much more difficult to prescribe an absolute rule and measure of duty. This fact is recognized in the provisions found in the statute upon which this action is prosecuted. It was well known to the lawmakers that in maintaining telegraph offices and stations for the transmission of orders, messages, and instructions, controlling the movement of trains, conditions and contingencies would arise when, to enforce an absolute, inflexible rule, as to period of service, would defeat the purpose of the law and endanger the safety of travelers, as was said by Judge Sanborn, in U. S. v. Mo. Pac. Ry. Co., 213 Fed. 169, 130 C. C. A. 5:

"Congress perceived, and reflection will convince any one, that the protection, safety, and welfare of travelers and employés upon railroads require that in such cases hard and fast rules shall yield to the demands of humanity and the necessities of the cases. The times when such casualties will occur and when such cases will arise cannot be foreseen."

We find, therefore, that, after prescribing the number of hours of continuous service permitted, provision is made for "cases of emergency," in which four additional hours are permitted, with the limitation, in this respect, of "not exceeding three days in a week." In these exceptions to the measure of duty imposed upon the railroad companies, it is not difficult to interpret the legislative mind and to understand the contingencies for which it was making provision. The lawmakers, while seeking to protect the employé from unreasonable demands, and the traveling public from the danger which a knowledge of the extent of the power of human endurance had taught was a safe measure of limitation, upon such power, also recognized the fact that the character of the service, the location of the stations and offices, at which, in many instances, the service must be rendered, and the fact that its efficiency was dependent upon the human element, with its manifold liabilities to unforeseen and unforeseeable conditions, made provision for an extended service of four hours in "case of

emergency," without any limiting or other restrictive terms, except that the extended service should not exceed three times in one week, thus giving what was deemed a reasonable opportunity to supply another operator for the one who might, for any reason, be either out of place or temporarily incapacitated for service. It is therefore the duty of the court to give to the language of the statute such an interpretation as will effectuate the intention of the Legislature and promote the purpose which it had in view. This is elementary. To seek to defeat this intention and purpose by listening to appeals for an unreasonable relaxation of the rule on the one hand, or a strained construction on the other, is an equally unauthorized and unwarranted mental attitude for the court to take. To ascertain the intention of Congress in using the term "in case of emergency," we should examine the entire statute.

[4] The form of the statute is somewhat peculiar. While the provision regarding the hours of service of telegraph and telephone operators is found in a proviso, it is really an enactment of what ordinarily would be found in an independent section, dealing with a class of employés, and a service, separate and distinct from those coming within the preceding clause of section 2 of the act. This is not material, except as it affects a rule invoked in the construction of statutes and applied in pleading. That the term "in cases of emergency" constitutes an exception and not a proviso is manifest from an examination of section 3 of the statute. Treating the dispensing or exemptive term as an exception, the rule of construction is well settled.

"There is a manifest distinction between a proviso and an exception. If an exception occurs in the description of the offense in the statute, the exception must be negatived or the party will not be brought within the description. But if the exception comes by way of proviso, and does not alter the offense, but merely states what persons are to take advantage of it, then the defense must be specially pleaded or may be given in evidence under the general issue, according to circumstances." Simpson v. Ready, 12 M. & W. 736.

"An exception exempts absolutely from the operation of an engagement or an enactment. A proviso defeats their operation conditionally. An exception takes out of an engagement or enactment something which would otherwise be part of the subject-matter of it. A proviso avoids them by way of defeasance or excuse." West. Assur. Co. v. Mohlman, 83 Fed. 811, 28 C. C. A. 157, 40 L. R. A. 561; United States v. Cook, 17 Wall. 168, 21 L. Ed. 538.

Such force as may be attached to the placing of the exceptive words does not relate so much to the rules of pleading, or the burden of proof, as to the suggestion that the provisos, found in section 3, indicate that the word "emergency" was used by Congress in a sense different from "casualty," "unavoidable accident," "act of God," or other like terms found therein.

It will be observed that, in prescribing the number of hours of service permitted to employés coming within the first clause of section 3 of the act, no exemption is prescribed. The penalty imposed for its violation can be avoided only by an appeal to the proviso found in section 3, whereas for an alleged violation of that clause of section 2, relating to telegraph operators, defendant is entitled to invoke the exemptive language found in the body of the enactment "a case of emergency." It will be observed that no terms, such as "extraordinary"

or "unforeseeable," limit the usual and ordinary meaning given to the general term, as in the proviso to section 3, "unavoidable accident" or "and which could not have been foreseen." The extent to which the provisos of section 3 may be invoked for violation of the provisions of section 2, relating to telegraph operators, is discussed by Judge Sanborn in U. S. v. Mo. Pac. Ry. Co., 213 Fed. 170, 130 C. C. A, 5.

[5, 6] The liability of defendant, therefore, must depend upon the meaning to be given the words "a case of emergency"; and, in doing this, it must be assumed that Congress used the term in that sense and with that meaning given it in general use, keeping in view the general scope of the statute.

"The apparent and natural meaning of the terms of a statute is always to be preferred to any curious, hidden signification deduced by the reflection and ingenuity of acute and powerful intellects; and, where the language of a statute is unambiguous and its meaning is plain, no room is left for construction." U. S. v. Mo. Pac. Ry. Co., 213 Fed. 169, 130 C. C. A. 5.

While the courts will endeavor to ascertain and enforce the legislative will, they will not, by strained and forced construction of statutes, give to them such effect as will render their enforcement harsh and oppressive. It is neither reasonable as a rule of construction, nor consistent with the genius of our system of government, to attribute to the legislative department an intention or purpose to entangle the citizen, either natural or corporate, into guilt, and impose punishment and penalties by strained construction of language. To do so would not only make our laws odious but undermine that feeling of confidence in the justice of the Legislature and the court, so essential to cheerful obedience and patriotic service.

"An act which is not clearly an offense by the expressed will of the legislative body before it was done may not be lawfully or justly made such by construction after it is committed, either by the interpolation of expressions or by the expunging of its words by the judiciary." U. S. v. Mo. Pac. Ry. Co., supra.

If, therefore, the defendant was confronted, on May 26, 1914, with an "emergency" and, rather than endanger the safety of travelers on its passenger trains and its employés in charge of both freight and passenger trains, permitted its operators at Kenly "to be and remain on duty for four additional hours," as the statute authorized it to do, no penalty was incurred. We find that the English word "emergency" is derived from the Latin "emergo," "to arise out of," as "something which arises suddenly out of the currents of events." Brewer, 416. Its synonym is "exigency." Crabb. It does not appear to be synonymous with "accident" or "casualty." It manifestly is not so with "act of God." It is a condition which may arise out of either. That the failure of defendant's operator Ethridge to return to Kenly at 2:30 o'clock p. m. arose out of, or was caused by, the unexpected failure of the recorder's court at Smithfield to dispose of the case, in which he was a witness, during the morning, is too clear for debate. "Emergency" is defined as:

"Any event, or occasional combination of circumstances, which calls for immediate action or remedy; pressing necessity; exigency." Webster.

"A sudden and unexpected happening; an unforeseen occurrence or condition." Century Dictionary; U. S. v. Sou. Pac. R. R. Co., supra.

It would seem that, accepting these definitions as correct, the failure of Ethridge to return to Kenly at 2:30 o'clock p. m., in time to take his "trick" at 4 o'clock p. m., presented "a case of emergency," within the statute. Of necessity, each case, as it is presented, must depend largely upon the facts therein.

In U. S. v. Sou. Pac. Ry., 209 Fed. 562, 126 C. C. A. 384, to the suggestion that the company should have had extra train dispatchers, under pay, ready to take the place of one who became ill, Carland, J., says:

"The law recognizes the fact that emergencies may arise. Congress, no doubt, used the word 'emergency' with reference to the business of dispatching trains when conducted in the exercise of the ordinary care required in such business. If Congress had intended that the railroads should provide against all emergencies, then there was no use in granting to the company the right to require longer hours in the case of emergency."

In that case one of the operators was taken ill. The train dispatcher was unable to procure an operator to take his place. This condition continued from August 27 to September 3, 1912, during which time the other operators were on duty for more than 9, but not exceeding 12, hours. It was held that the chief dispatcher was not required to take the place of the one who was sick.

In U. S. v. Mo. Pac. Ry. Co., 213 Fed. 169, 130 C. C. A. 5, the operator was on duty in excess of the 9 hours prescribed by the statute and the additional 4 hours permitted to meet an emergency. Defendant was therefore compelled to rely, for a defense, upon the provisos to section 3. It appeared that the necessity grew out of a wreck on its road.

"Every possible effort was made to clear away the wreck at once. When the wreck occurred, the defendant expected to clear it away by 11 o'clock p. m., December 11th, which would have been 3 hours within the 17 hours of service permitted in case of accident. The company could have procured a relief operator at the time the wreck occurred, but it did not know and could not foresee that one would be necessary. It expected and believed that the wreck would be cleared by 11 o'clock. Subsequent unavoidable difficulties delayed the clearance until 5 a. m., December 12th, and made the continuous service necessary until 6:35 a. m. of that day."

The court held that "this was a case of unavoidable accident," and the continuous service necessary.

In United States v. N. Y., O. & W. Ry. Co. (D. C.) 216 Fed. 702, it appeared that one of the operators was taken suddenly sick, thereby causing another operator to remain on duty—held to be a casualty. In the same case it appeared that the mother of one of the operators, who was living with him, died suddenly and unexpectedly, and that for this reason he did not report for duty, and another operator was required to work for more than nine hours. In an interesting discussion, Judge Ray decides that these conditions were casualties. In U. S. v. Denver & R. G. R. Co., 220 Fed. 293, 136 C. C. A. 275, one of the operators, on September 8, 1912, became insubordinate and was, for that cause, dismissed. It was impossible to obtain another operator to take his place until September 10, 1912, which rendered it necessary

for the other operators to remain on duty more than 9 hours in a period of 24 hours. The court held that the conduct of the operator created an emergency which the company was called upon to meet, by extending the hours of service.

In San Pedro, L. A. & S. Ry. Co. v. U. S., 220 Fed. 737, 136 C. C. A. 343, it appeared that the company, as in the instant case, employed three operators at Kelso, whose regular hours of service were the same as here. One of them was taken ill January 16th. An operator was started on the 17th, from the nearest available point, to relieve the other two, in time to have reached Kelso within three days, "but unfortunately the train on which he was proceeding was derailed, * * * blocking the main line," resulting in a delay which rendered it necessary for the other operators to be and remain on duty in excess of the prescribed hours during January 20th and 21st. The court held that these conditions relieved the road of the penalty.

In Delano v. U. S., 220 Fed. 635, 136 C. C. A. 243, the only question decided was that the company does not escape liability for requiring a train dispatcher to remain on duty for a longer period of time than prescribed by the statute, by showing that, during a part of the time, he was employed otherwise than as a train dispatcher. The sole point decided in U. S. v. Ch. & N. W. Ry. Co. (D. C.) 219 Fed. 342, is that delays in the departure of trains is not an emergency, within the statute. This is manifestly true.

[7-9] It is, however, insisted that the defendant is not entitled to the immunity granted by the statute because Ethridge went to Smithfield as its witness in the case set for trial and was in its service. While it is true that he was under subpœna as defendant's witness, his duty to obey the summons was not because of his contract relation with defendant, but because he was a citizen of the state. A failure to do so would have subjected him to a penalty (Pell's Rev. § 1643) and to be attached for contempt. His attendance, while at the suggestion of defendant, was at the command of the court, and pertained to the administration of justice, and therefore imposed upon the defendant no other or higher degree of duty for making provision for meeting the requirements of the statute by reason thereof than if summoned by any other party to a suit. Judicial notice may be taken of the fact that Kenly is about 10 miles south of Smithfield, on defendant's main line of road. Notice may also be taken that the recorder's court at Smithfield had a local and restricted jurisdiction, and usually tried and disposed of cases without the intervention of a jury. That, as admitted, the court met on Monday morning, and usually held its session only half the day, is entirely consistent with well-known conditions. Ethridge reached Smithfield at 9 o'clock, in ample time to be present when the court opened, and remained in attendance until 1 o'clock, when, seeing that the case would not be called in time to enable him to return to Kenly on the train arriving at Smithfield at 2:10 o'clock p. m. and reaching Smithfield at 2:30 o'clock p. m., he walked some distance to reach a telegraph office and notified the special dispatcher at Rocky Mount, some 40 miles north of Smithfield, of the unforeseen condition or emergency which had arisen. In this he would seem to have done

all that was possible to meet the unexpected condition. It is admitted that, at that time, No. 89, the only train passing Rocky Mount, going south, had left, and it was impossible, except by dispatching a special train, for defendant to have put another operator at Kenly by 4 o'clock p. m. No other train reached Kenly until 10:02 o'clock p. m. Ethridge returned at 7:30 o'clock p. m. from Smithfield, by automobile.

As to the first count, it would seem that the defendant, in permitting operator Scott to remain on duty from 8 o'clock a. m. until 8 o'clock p. m. on May 26th, being 3 hours in excess of the 9 hours prescribed, except "in case of emergency," is not liable to the penalty.

Ethridge returned to Kenly at 7:30 p. m.; "by reason of being up since 4 o'clock a. m. was fatigued and reported that he was sick." It is admitted that operator Scott "went at the instance of the chief dispatcher to have Ethridge resume his 'trick.'" It is admitted that no substitute could have reached Kenly until 10:02 of the night of the 26th. It does not appear at what hour the chief dispatcher at Rocky Mount was notified that Ethridge reported at Kenly "sick." Allsbrook went on duty at 8 o'clock a. m. on the 27th. Conceding that the sickness of Ethridge was an emergency, and that it arose at 7:30 p. m. of the 26th, the question is presented whether the chief dispatcher should not have caused a supply to be at Kenly on the train reaching there at 10:02 p. m., which leaves Rocky Mount at 8:32 p. m., or shown that one could not be had. It was the duty of Ethridge to report promptly his physical condition upon reaching Kenly. It is provided that:

"In all prosecutions under this act the common carrier shall be deemed to have knowledge of all acts of its officers and its agents."

The chief dispatcher was notified at 1 o'clock p. m. that Ethridge was detained at Smithfield beyond the schedule time of the train reaching Kenly at 2:30 p. m. It does not appear whether he was informed that he could or would return on an automobile. Assuming that he was notified that Ethridge had returned to Kenly at 7:30 o'clock, sick, he knew that Allsbrook, the operator going on at 8 o'clock p. m., would be compelled to remain on duty more than 9 hours, unless Scott, who had been on 12 hours, took his trick at 5 o'clock a. m. There is no suggestion that he did not have an operator at Rocky Mount, whom he could have sent to relieve the situation at Kenly. The sole question, therefore, is whether, when the emergency caused by Ethridge's sickness arose, the defendant was prevented by a casualty, or unavoidable accident, from meeting it, and thereby avoiding the necessity for the extended service from 5 a. m. to 8 a. m. of the 27th. In the cases cited, wherein there was a sick emergency, the chief dispatcher promptly undertook to supply the missing or sick operator, but was prevented by casualties or accidents. Here there was no effort made to do so. While I do not follow the argument of counsel that, for the purpose of fixing liability on the company, Ethridge is to be regarded as on duty from 4 o'clock a. m. until 7:30 p. m., and that therefore no defense, under the exemptive terms of the statute, is open to the defendant, I am unable to find that the extended period of service from 5 a. m. to 8 a. m. on the morning of the 27th was caused by an emergency or by a

casualty. The absence of an explanation of the failure to supply the place of Ethridge on the morning of the 27th brings this extended period of service within the statute. I am of the opinion that a penalty in the sum of $100 should, under the circumstances, be imposed.

On the second count judgment will be entered for plaintiff for $100 and cost.