report to the issues raised by the pleadings. To this extent the official acts judicially, and his conclusion binds the court. To any other extent his findings are not the findings of a referee, as the term is meant by the statute, and the court is to render the proper judgment agreeably to the actual determination of the facts upon which the referee was authorized to pass. For the reasons stated, the plaintiff's motion for judgment is granted.

Motion granted.

---

COOPER v. NEW YORK, L. & W. RY. CO. (No. 1.)

SAME v. DELAWARE, L. & W. R. CO. (No. 2.)

(Supreme Court, Appellate Division, Fourth Department. November 13, 1907.)

1. WATER COURSES—INJURIES BY FLOWAGE—OBSTRUCTION OF STREAM BY RAILROAD BRIDGE.

Whether a railroad, erecting and maintaining a bridge across a stream, negligently aligned the piers and abutments thereof, and thereby caused the land of another to be overflowed, held, upon the evidence, a question of fact for determination by the referee.

2. DAMAGES—INJURY TO REAL ESTATE—MEASURE OF DAMAGES.

Where injury to real estate is permanent, the measure of damages is the diminution in its value; and where injury is for a limited time only, the measure is the diminution in the rental value, except where the cost of restoring the land to its former condition is less than the diminution in value, in which case the cost is the measure.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 273–278.]

3. WATER COURSES—INJURIES FROM FLOWAGE—OBSTRUCTION OF STREAM BY RAILROAD BRIDGE—DAMAGES.

A judgment in an action against a railroad for overflowing an owner's land, which compels the railroad to pay a specified sum for the restoration of embankments thereon, and to restore the embankments, or to take a conveyance, is erroneous, for, if it takes the land and the owner is paid its full value, he cannot recover for the restoration of the embankments.

4. SAME.

In an action against a railroad for overflowing an owner's land, evidence held not to support the damages allowed for fences and for loss in rental value.

5. SAME.

In an action against a railroad for overflowing an owner's land, evidence held not to support the damages awarded for depreciation in the value of the land.

6. APPEAL—REVIEW—QUESTIONS REVIEWABLE—VIEW BY REFEREE.

Where, in an action for injury to real estate, the order of reference provided that the referee might view the land, and the referee certified that the case contained all the evidence, and he viewed the land, the court on appeal must presume that there was no other evidence than that certified, and that the referee only viewed the premises to aid him in applying the evidence, rendering the question of the excessiveness of the damages reviewable.

7. COSTS—ADDITIONAL ALLOWANCE.

An owner, suing a railroad for overflowing his land by the negligent construction of a bridge across a stream, held not entitled to an additional allowance as costs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Costs, §§ 620–635.]

Appeal from Special Term, Steuben County.

Separate actions by Theodore Cooper against the New York, Lacka-wanna & Western Railway Company and against the Delaware, Lacka-wanna & Western Railroad Company. From judgments for plaintiff in each action, defendants appeal, and from an order denying plain-tiff's motion for an additional allowance of costs in each action, he ap-peals. Affirmed on plaintiff's appeals, and reversed on defendants' appeals, and new trials granted.

The plaintiff's lands adjoining the Conhocton river were overflowed by the waters thereof from time to time, and damaged. The plaintiff contends that the flowage of the river during high water was diverted from its original course by the improper and negligent manner of the alignment of the piers and abutments of the bridge which carries the railroad across the river, and which is located just above the lands in question; that they should have been aligned with reference to the high-water current, and not the low-water current; that there were also contributing causes for which the railroad com-pany was responsible, but that the primary cause was the improper alignment of the piers and abutments, causing the natural flow of the water to be di-verted from its northerly course, from the northerly bank of the river, to take a more southerly course over the plaintiff's lands; that the volume of water was so great and the current so strong in flowing over and across these lands that it removed the rich alluvial soil, leaving the land practically worth-less. Action No. 1 was brought to recover for damages, and action No. 2 for a mandatory injunction. Both actions were referred to the same referee and were tried together. The referee awarded as damages in action No. 1 the sum of $1,732.37. In action No. 2 he directed judgment for the mandatory injunc-tion, with the option to the railroad company to take title to the 70 acres, up-on payment of the sum of $10,600, with costs of the action, as has been stated. Judgments were entered upon the decisions of the referee accordingly.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frederick Collin, for appellants.
Henry W. Jessup, for respondent.

KRUSE, J. While we are not disposed to disagree with the con-clusions of the learned referee that the overflow of the lands in ques-tion, and the consequent injury thereto, was caused primarily by the improper and negligent alignment of the bridge piers and abutments, and that the defendant is legally liable therefor, we think that his find-ings of the value of the lands and the amount of the damages cannot be sustained. Two bridges have been constructed at this place by the railroad company, one in 1881 and the other 20 years later. The first bridge rested upon two abutments and a single pier, and the last was supported by two abutments and four piers. The piers and abutments of both bridges were aligned with the current of the river at low water. The plaintiff contended that the current of the river at high water or flood time was more northerly than when the water was low; that when the water was high the current hugged the north bank of the river, at and below the north end of the bridge; that the piers and abutments diverted the water out of its course and in a more southerly direction, against and over the lands in question on the south side of the river; that the waters not only overflowed his lands on the south side, but cut off the supply of water conveyed through a race from the

river to his mill on the north side, of the river, practically destroying
the mill power.

Before the second bridge was built an action was brought by the
plaintiff and his co-owners of the mill property to recover damages
to the mill property. The suit was compromised, the railroad company
acquiring the mill property, and the plaintiff releasing all claims for
damages up to that date; it being expressly understood that the release
should not be evidence of the railroad company's liability. While it
was understood that the release should not be evidence of the railroad
company's liability, and was so stated in the release, it was notice of
what the plaintiff claimed respecting the alignment of the abutments
and piers. Besides, the plaintiff, who was a consulting engineer, con-
tends that he foresaw, when the first bridge was building, the harm
that would come to his lands by such alignment, and informed the engi-
neer in charge of that fact, but was unheeded. However that may be,
there can be no doubt that the railroad company had notice of the
plaintiff's claim respecting the alignment of the pier and abutments be-
fore the second bridge was built, and that the piers and abutments
were aligned as before. It is contended, however, upon the part of
the railroad company that the alignment is proper, and that the piers
and abutments do not divert the water. The piers for the last bridge
were built in 1901. In March, 1902, the lands in question were over-
flowed, and have been overflowed periodically since that time. The
currents have been so strong, and have come against the south bank
with such force, as to destroy a dike which the plaintiff had constructed
along the south bank, carrying away rich alluvial soil, and rendering
the overflowed lands practically worthless, as the plaintiff claims. There
are other facts and circumstances both for and against the plaintiff's
contention, but we deem it sufficient to say that upon the whole evi-
dence a fair question of fact was presented upon the question of the
defendants' liability.

2. We think, however, that the referee erred upon questions of
value and damage. The general rule for measuring damages to real
property, where the injury is permanent, is the diminution in its value.
If the injury is for a limited time only, the diminution in the rental
value. If, however, the injury may be repaired or the land restored
to its former condition, the reasonable cost thereof, if less than the
diminution in value of the whole property, is the proper measure of
damages. Sedgwick on Damages (8th Ed.) §§ 932–942; Hartshorn
v. Chaddock, 135 N. Y. 116, 31 N. E. 997, 17 L. R. A. 426; Higgins
v. New York, Lake Erie & Western R. R. Co., 78 Hun, 567, 29 N. Y.
Supp. 563; Senglaup v. Acker Process Co. (Sup.) 105 N. Y. Supp.
470. In action No. 1 the plaintiff was awarded as damages the sum
of $1,732.37, made up of $632.37 loss in rental value, $1,000 value of
the dikes and embankments destroyed, and $100 for fences. In action
No. 2 the referee finds that 70 acres of the plaintiff's meadow land
were reasonably worth $125 an acre, which were destroyed for all
practical farming purposes, and are now worth not more than $5 an
acre, fixing as damages to the 70 acres the difference, which is $8,400,
and finding, further, that the balance of the farm is depreciated in val-
ue the sum of $2,200, making in all the sum of $10,600, damages for

permanent injuries, and directs that upon payment of that sum the plaintiff convey the 70 acres to the railroad company; but, if not paid within the time stated in the decision, judgment for a mandatory injunction is directed, requiring the railroad company, among other things, not only to reconstruct the bridge, but to restore the dikes and embankments. It will thus be seen that the railroad company is not only compelled to pay the $1,000 for the restoration of the dikes and embankments by the judgment in action No. 1, but is also required to restore the dike by the judgment in action No. 2, or, if it chooses, take a conveyance of the land.

Manifestly, if the railroad company takes title to the land and the plaintiff is paid full value therefor, he is not also entitled to recover for restoration. Moreover, the evidence of the cost of restoration is itself very unsatisfactory. Although the plaintiff at first testified that it would cost from $1,500 to $2,000 to put the dike back and get the same result, upon cross-examination he disclaims that it would cost that sum, and thinks that $500 would fairly represent the labor and time, stating that it was difficult to estimate the cost. As regards the $100 allowed for fences, I fail to find any evidence upon which to base that finding. Neither do I see how the one of $632.37 for loss in rental value can be upheld. That finding seems to be based, so far as it is supported by any evidence in the record, upon the fact that the tenant upon the farm had agreed, before the premises were flooded in the spring of 1902, to pay $450 annual rent, and the plaintiff's testimony (admitted against objection and exception of the defendants) as to the amount of rent that he had actually received, and the further fact that he had released the tenant from the payment of certain back rent after the overflow of the lands in 1902. The finding of the referee upon that subject is that the plaintiff was required to forego the sum of $1,500 back rent, and since that time has only received from the tenant the sum of $219 in 1902 and $133.90 in 1903. This finding is supplemented by the further finding that, while the tenant had only paid the amount of rent specified, the diminution in rental value of the farm as a whole should be computed in the amount of $150 a year, making in all for five years, from 1902 to 1906, $750. From this the referee deducts one-third the amount received from the tenant, leaving the sum of $632.37. It is difficult to determine from the evidence the diminution in the rental value, or upon what legal principle this sum is awarded to the plaintiff. The evidence and the findings as to what the contract was between the plaintiff and the tenant are not clear. The plaintiff testified that after the overflow a new arrangement was made with the tenant; that the plaintiff was to put stock upon the farm and supply the tenant with cows to the extent of the feed; that the tenant was to care for the cows, and that he and the tenant were to take shares of the produce; and to forego payment of the back rent.

The evidence upon the question of permanent damages is equally unsatisfactory. In his bill of particulars the plaintiff fixed the value of the 70 acres at $100 an acre. In his testimony upon the subject of the value of the lands, he stated that he had estimated the value of the 70 acres at $100 an acre; that, if the property was not endangered by flood, he would be very loath to accept less than $70 an acre for the

whole farm; that there were 20 acres absolutely denuded of soil, high-
ly cultivated, seeded, and manured for years, and used for tobacco
land, from which the farmer paid his rent, which he estimated at $100
an acre; that he had estimated four years' loss of rent on the 20 acres
at $10 an acre, and that the remaining 50 acres was endangered to a
considerable extent and in such a condition as to reduce its value at
least three-quarters; that it is becoming unarable, and will become
unproductive property. He estimated the 50 acres depreciated in
value $80 an acre. The defendants' counsel objected to that method
of proving the damages, but the evidence was received. Harmon
Stevens, a witness for the plaintiff, testified that he had seen the time
that land was worth $100 an acre, and now, with the depreciation of
real estate, it would be worth $75 an acre. Speaking of the meadow
land, he thought it was worth but $5 an acre since the overflow. Two
witnesses were sworn on behalf of the defendants upon the question
of value. One of them testified that the farm, prior to March, 1902,
was worth $7,000, and was then worth $6,500; that the 70 acres of
meadow land, if in the condition that it was described, would then be
worth $45 or $50 an acre. The other witness testified that the value
of the farm prior to the damage in 1902 was about $7,000, and after-
ward $6,500 or $6,600. Upon cross-examination he testified, as re-
gards the 70 acres, that if it was never subject to flood, and was kept
plowed and seeded, and had the best crop of timothy and clover in the
township, and if the flood came year after year for many years and
improved the soil, and did not interfere with the productivity of the
crops, he would then think it worth $125 to $150 an acre. The referee
fixed the value of the 70 acres at $125 an acre, and finds that they were
damaged to the extent of $8,400, being at the rate of $120 an acre;
that another 70 acres were depreciated in value $1,400, being $20 an
acre, and an additional 20 acres were depreciated $800, being $40 an
acre, amounting in all to $10,600.

We think the evidence does not sustain these findings. It should,
however, be said that counsel for the plaintiff did not rely, and does
not now rely, solely upon the evidence contained in the record to es-
tablish the value and the amount of his damages. He insists that the
referee learned additional facts from viewing the premises, which he
had a right to consider as independent evidence, and that the questions
of fact are not now open to review upon this appeal. The order of
reference, entered upon stipulation of the attorneys for the respective
parties, provided that the referee might view the premises claimed
to have been damaged, and the referee did view the premises during
the progress of the trial. What he saw and learned at that time, and
what was taken into consideration by him in determining the ques-
tions involved in this action, we do not know, beyond what is con-
tained in the record. We must assume that there was no other evi-
dence, since the referee has certified that the case contains all of the
evidence, and that he viewed the premises to better understand the
evidence, and aid him in applying the evidence to the questions for his
determination. Claflin v. Meyer, 75 N. Y. 260–267, 31 Am. Rep.
467. In the case of Hentz v. City of Mt. Vernon, 78 App. Div. 515,
516, 79 N. Y. Supp. 774, it was held that under the stipulation in that

case, in the absence of evidence that the referee proceeded upon an erroneous theory of the law, no questions of the amount of damages' were reviewable upon the appeal. But the stipulation in that case is quite unlike the provision contained in the order of reference in this case. There it was expressly stipulated that the referee might take into consideration his view in determining the case, not only his view as to the obstructions, as to the lay of the land, and its condition, but that his inspection should be used with the same force as if he were a commissioner to determine the value of real estate. Here the order of reference simply provided that the referee might view the premises.

As regards the orders denying an additional allowance, we think the motions were properly denied. Swan v. Stiles, 94 App. Div. 117, 87 N. Y. Supp. 1089; Frey v. New York Central & H. R. R. R. Co., 114 App. Div. 623, 100 N. Y. Supp. 229.

The orders denying the motions for additional allowance should be affirmed, and the judgments appealed from reversed, and a new trial granted, with costs to the appellants to abide the event. All concur.