## HARRY JOHNSTON GRANT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51794.   Promulgated June 26, 1934.

*Edwin S. Mack, Esq., James B. Blake, Esq.,* and *Leon F. Foley, Esq.,* for the petitioner.

*W. Frank Gibbs, Esq.,* for the respondent.

1032

# 1034

OPINION.

McMahon: The petitioner contends that he is entitled to a deduction for loss sustained during the year 1927 and not compensated for by insurance or otherwise, under section 214 (a) (6) of the Revenue Act of 1926.[1]

The principal question to be determined is whether the sinking of petitioner's property described in our findings is within the meaning of the phrase " *or other casualty*." (Emphasis supplied.)

As appears from the statement attached to the notice of deficiency, the respondent in determining the asserted deficiency "conceded" that the petitioner was "entitled to a deduction * * * for loss sustained from *casualty*" for the year before us, "to the extent of" $14,684.26. (Emphasis supplied.)

In proceedings of this character a decision turns upon the facts and circumstances of each proceeding; and, under the peculiar and unusual facts and circumstances detailed in our findings of fact, the Commissioner was correct in thus treating the phenomenon there described as a casualty. In our opinion the loss was the result of a casualty within the meaning of the statute.[2]

As appears from the statement attached to the notice of deficiency, the respondent attributes the damage done to petitioner's property

[1] Sec. 214. (a) In computing net income there shall be allowed as deductions:

(6) Losses sustained during the taxable year of property not connected with the trade or business (but in the case of a nonresident alien individual only property within the United States) if arising from fires, storms, shipwreck, or other casualty, or from theft, and if not compensated for by insurance or otherwise. The basis for determining the amount of the deduction under this paragraph, or paragraph (4) or (5), shall be the same as is provided in section 204 for determining the gain or loss from the sale or other disposition of property.

[2] *Chicago, etc. R.R. Co.* v. *Pullman Car Co.*, 139 U.S. 79, 86; *Benjamin or Metropolitan St. Ry. Co.* 151 S.W. (Wis.) 91; *William J. Mattheson*, 18 B.T.A. 674; affd., *Mattheson* v. *Commissioner* 54 Fed. (2d) 1537; *Shearer* v. *Anderson*, 16 Fed. (2d) 995; Webster's New International Dictionary; Black's Law Dictionary; Ballentine Law Dictionary; Bouvier's Law Dictionary; vol. 1, Words & Phrases, 1st, 2d and 3d series; 11 C.J. 29–30, cases cited therein; *United States* v. *New York O. & W. Ry. Co.*. 216 Fed. 702, 705; O.D. 1076, 5 C.B. 138 (1921) ; and I.T. 2231, C.B. IV–2, p. 53. See also *Eaton* v. *Glinderman*, 195 Pac. (Ida.) 90; *Webb* v. *Baldwin*, 147 S.W. (Mo.) 849, 851; *Brisco* v. *Metropolitan St. Ry. Co.*, 120 S.W. (Mo.) 1162; Century Dictionary; 1 C.J. 390–392, 394–395, 1173–1180, and cases cited therein.

to " a certain underground disturbance, which resulted in the sudden subsidence of the surface of a portion of " the land.

In the instant proceeding there was the unexpected, unusual, unlooked for extensive physical alteration of the earth's surface, in the nature of a catastrophe, which resulted disastrously to the petitioner.

The evidence is clear and undisputed that the sinking was unexpected. It did not proceed from a definitely known cause. It was not an ordinary sliding of the bank, often occuring on lake shore property, but was the result of a subterranean disturbance, the exact cause of which is not known or ascertainable. It was an unusual effect of several causes and conditions. We hold, therefore, that the phenomenon, as heretofore described, was a casualty within section 214 (a) (6).

The instant proceeding is distinguishable, upon the facts, from the situation presented in I.T. 1567, C.B. II–1, p. 90, referred to by respondent in his statement attached to the notice of deficiency but not cited in argument or on brief. It involves ordinary action of the sea, during storms, upon residence property adjacent thereto, requiring no expenditures for repairs or removal.

As appears from this same statement, respondent allowed petitioner to deduct his loss to the extent of $14,684.26. This apparently was done upon the theory, which we deem to be correct, that a loss resulting from a casualty, under section 214 (a)(6), is deductible notwithstanding that the property has not completely disappeared or has not been completely destroyed. While no question in this respect has been raised in the pleadings, at the hearing, or on brief, it may not be amiss to point out that it has been repeatedly held by the courts and the Board, under this and similar sections in other acts, that losses resulting from partial destruction of or damage to property attributable to causes specified in these sections are deductible; [3] and no authorities to the contrary have been cited or have come to our notice. In *Shearer* v. *Anderson*, 16 Fed. (2d) 995, the court said: " Shipwreck *does not mean complete loss; damage* to the ship suffices. * * * Furthermore the ship may be a pleasure yacht in no way connected with a trade or business."

The next question to be determined is the amount of the loss arising from the casualty sustained by the petitioner.

The respondent on brief suggests two " yardsticks " or methods for determining the amount of the loss: (1) The amounts expended by

[3] *Ferguson* v. *Commissioner* (C.C.A., 10th Cir.), 59 Fed. (2d) 893; *Pioneer Cooperage Co.* v. *Commissioner* (C.C.A., 8th Cir.), 53 Fed. (2d) 43; certiorari denied, 284 U.S. 686; affirming *Pioneer Cooperage Co.*, 17 B.T.A. 119; *Whipple* v. *United States* (U.S. Dist. Ct., Dist of Mass.), 25 Fed. (2d) 519; *Shearer* v. *Anderson* (C.C.A., 2d Cir.), 16 Fed. (2d) 995; *Francis M. Bass*, 30 B.T.A. 4; *Frederick H. Nash*, 22 B.T.A. 482; *John S. Hall*, 16 B.T.A. 71; *Mary Cheney Davis*, 16 B.T.A. 65; *W. B. Brooks*, 12 B.T.A. 31; *W. B. Bronson*, 9 B.T.A. 1008; and *F. M. Reed*, 6 B.T.A. 1140.

the petitioner during 1927, 1928, 1929, and 1930 to arrest the sinking of the land and to restore the property to its original condition, citing *Shearer* v. *Anderson, supra;* and (2) the amount obtained by multiplying the cost by the difference between the value immediately before the casualty and the value immediately after the casualty divided by the value immediately before the casualty, as follows:

$$\frac{\text{Value prior to casualty} - \text{value after casualty}}{\text{Value prior to casualty}} \times \text{cost} = \text{amount of loss},$$

or, arithmetically expressed in the figures presented in this proceeding:

$$\frac{\$113,750 - \$50,000}{\$113,750} \times \$128,903.41 = \$72,242.57, \text{ the amount of loss.}$$

In our opinion the aggregate amount expended by the petitioner for repairs does not adequately or fairly measure the loss sustained by him as a result of the casualty. The evidence discloses that the repairs made did not restore the property to its original condition before the casualty and that such amount does not represent the loss sustained based on cost. Furthermore, there is no basis in the statutes for holding that cost of repairs measures the amount of the loss in a situation such as we have here. Moreover, section 214 (a) (6) of the Revenue Act of 1926 expressly provides that the basis to be used in determining the loss shall be the same as provided in section 204 of the same act.[4] Under the latter section " cost " is the basis applicable where, as in the instant proceeding, the property was acquired after February 28, 1913.

There is, however, nothing in the applicable provisions of the statutes contrary to the second of the " yardsticks " suggested by respondent and illustrated by the formula. We have not overlooked section 202 (a), Revenue Act of 1926, which, among other things, is expressly limited to situations where something may be *realized*.

The loss allowed by the act is a loss arising from casualty. The difference between the value of the property prior to the casualty and its value after the casualty constitutes the loss due to the casualty. However, under the applicable provisions of the act, in determining the amount of the deductible loss, cost must be used as the basis, the amount of the deductible loss in the event of total loss being limited to the cost of the property and in the event of partial loss being limited to a proportion of the cost dependent on the difference in values before and after the casualty (the same being wholly due to the casualty) as compared with the value before the casualty. This is most clearly illustrated by the formula set forth above, and

---

[4] SEC. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property ; * * *

is a fair and reasonable way of determining the amount of the loss caused by the casualty. Hence, the amount of deductible loss is $72,242.57, which in our opinion is the amount of the loss sustained by the petitioner, due to the casualty, under the applicable statutes.

While the respondent on brief contends that the petitioner has failed to show that the damage to his property was the result of a casualty, it appears from the statement attached to his notice of deficiency that he conceded that the petitioner was entitled to a deduction for loss sustained from a casualty to the extent of $14,684.26. Therefore, this amount, if it has been allowed as a deduction by the respondent in his computation of petitioner's tax liability for the year 1927, is to be deducted from the amount of $72,242.57, upon recomputation of petitioner's tax liability under Rule 50 in accordance with this opinion.

*Shearer* v. *Anderson, supra,* thus relied upon by the respondent, is not controlling. It is governed by the 1918 Act which contained no provisions, such as are applicable in the instant proceeding, to the effect that the basis shall be cost. These provisions first appeared in the 1924 Act.

In *Tracy V. Buckwalter*, 20 B.T.A. 1005, which arose under the 1924 Act and involved a loss caused by fire, value prior to the fire was used as the basis. However, in *E. C. O'Rear*, 28 B.T.A. 698, which arose under the 1921 Act and involved the destruction of a residence by fire, the Board stated:

The deduction for fire loss must be computed upon the cost of the property acquired subsequent to February 28, 1913, and upon the fair market value on March 1, 1913, of the property acquired before that date. Sec. 214 (a) (6), Revenue Act of 1921. In *Tracy V. Buckwalter*, 20 B.T.A. 1005 (affirmed on other points 61 Fed. (2d) 571), the Board erred in using value at the time of destruction. The cost and value should not be reduced by depreciation or obsolescence. *Deposit Trust & Savings Bank, Executor*, 11 B.T.A. 706; *W. B. Brooks*, 12 B.T.A. 31; affirmed on other points 35 Fed. (2d) 178. Cf. *J. A. Talbot*, 23 B.T.A. 792.

Respondent also contends that the burden of proof is upon the petitioner to show that the damage was due to one of the causes set forth in the statute and that upon the evidence the doctrine of *ejusdem generis* can not be applied, for it is not shown what specifically caused the damage. As heretofore indicated, we can not agree with the reason given for this contention. We agree, however, that the doctrine is not applicable here.[5]

The respondent contends further that the loss claimed represents a mere diminution in value of the property and has not been finally determined by a closed and completed transaction.

[5] *Mason* v. *United States*, 260 U.S. 545; *Corona Coal Co.* v. *United States*, 21 Fed. (2d) 489; cases cited in 36 Cyc. 1121–1122; *Prussian* v. *United States*, 282 U.S. 675, 679; *United States* v. *Mescall*, 215 U.S. 26; and *Motty Eitingon*, 27 B.T.A. 1341. See also *Shearer* v. *Anderson*, 16 Fed. (2d) 995.

On brief, however, respondent takes the position that "a casualty to property constitutes *a disposition* of the property", citing *Pioneer Cooperage Co.*, 17 B. T. A. 119; affd., 53 Fed. (2d) 43; certiorari denied, 284 U.S. 686. Furthermore, it has been held that when a casualty occurs resulting in a loss the transaction is *closed* and the amount of the loss is deductible, under provisions essentially similar to the corresponding provisions applicable in this proceeding.[6]

The respondent contends further that, granting a casualty was the cause of the damage to petitioner's property, the amount of the loss should be limited to the land, as the house was in no way physically damaged. We do not agree with this contention.

It is common knowledge that the location of a residence, as well as its surroundings and the character of the neighboring property, greatly affects the value not only of the land, but, perhaps to a greater extent, that of the buildings thereon. Location, adaptability, and usefulness for either commercial, agricultural, or residential purposes give land value for purchase, sale, and ownership. This applies to buildings or other improvements on the land. They become an integral part of it and to divorce them in the situation here present would be contrary to the common, ordinary understanding and conception of such values.

In 1927 an event occurred which clearly and beyond doubt established the instability of the land, at least for a period extending over a number of years. The loss sustained by the petitioner arose from an identifiable event which established instability. That fact becoming public knowledge, because of the unusual and extraordinary character of the event and its peculiar result and effect, completed and fixed the loss so that it was capable of being ascertained in terms of dollars and cents. The continuing manifestation of such instability and the effect of the remedies applied are in the nature of cumulative evidence of the instability of the land.

No mere paper loss or fluctuation in price or value is here involved. Though the petitioner retained the property and the loss must be measured as heretofore indicated, the loss is an actual loss, for it resulted from damage to and destruction of petitioner's property. In testifying on cross-examination with respect to the method pursued by the committee which appraised the property for the Milwaukee Real Estate Brokers Board, a member of the committee, as witness for the petitioner, in a few sentences rather graphically described the damage:

We did not have to inspect the depression very carefully because, as we got into the second floor and looked out over the bedroom; we looked down a very precipitous bank; in fact, perpendicular, 40 to 50 feet, with a raw clay

---

[6] To this effect are the cases cited in footnote No. 3.

bank there, and we did not dally any longer than we had to in that building—I am frank to say that—for fear that there might be a further depression. This was very extensive in width, and at that time no one could tell whether that would go any further.

He testified further on cross-examination as follows:

Q. And, it is your opinion that this simply affected the value of the land, and not the physical value of the house?

A. Oh, no, it affects the value of the building just as much as if the new courthouse was placed in the middle of the Sahara Desert. It would be valueless. This is the overdevelopment of an inferior lot, which immediately reflects upon the value of the improvement.

Q. When did you visit this property prior to the appraisal by the Committee?

A. When the publicity first occurred relative to this phenomenon, which was possibly a period of three to six months prior to the time of the appraisal—six months more likely than three months.

\*          \*          \*          \*          \*          \*          \*

Q. And the day after this thing occurred, you could not have gotten a purchaser for any more than $48,000?

A. Yes; and I do not believe I could have gotten that for it, unless the purchaser might not have gotten full information of what had occurred there, after restoration.

\*          \*          \*          \*          \*          \*          \*

The damage to the house was none the less actual and real. The land upon which the house was located was injured. There was a subterranean disturbance, not visible to the eye. There was a level space about thirty feet in width between the house and the edge of the slope prior to the casualty, which was reduced to a width of about eight feet. Land, 22 feet in width, level with the base of the house, dropped 40 to 50 feet, and the contour of the slope was drastically changed, destroying that part of the property which gave it the greatest beauty and value.

It is true that various situations may arise where the injury to land may not affect the buildings and improvements thereon or only in a slight degree. However, such is not the case here, and the house and lot should be treated as a unit in measuring the loss sustained. Here the injury to the land caused greater damage to the house than to the land itself when viewed in the light of cost and values. The cost of the house was $102,092.93, and the cost of the lot was $26,810.48. However, the fair market value of the house and lot after the sinking of the land was $36,500 and $13,500, respectively. This results in a decrease from cost to fair market value of $65,592.93 and $13,310.48 on the house and lot, respectively. or a decrease of approximately 64 percent on the house and approximately 49 percent on the lot. This decrease does not represent a mere diminution in value resulting in the usual and ordinary course of events, in which case no deduction would be allowable, but a loss caused by an event which was unforeseen, unusual, unexpected,

not brought about by economic conditions, a change in its use, or by acts of the petitioner or others. The cause of the loss was entirely beyond his control and due to a subterranean disturbance.

While we are not here concerned with the recovery of damages or indemnity for loss resulting from unlawful or wrongful act, it may not be inappropriate to point out the rule evolved in that regard in reference to the measurement of damages where the injury to land is of a similar character. As a general rule the diminution in value of the whole property is the measure of damage where the injury to realty is of a permanent nature.[7] In *Nelson* v. *Village of West Duluth*, cited in this footnote, the court further held that the trial court did not err in excluding evidence of the separate value of the building on the lot, since the evidence that was admitted showed the value of the whole property, land and building, before the injury and after the injury.

Apparently the above rule was followed in cases which arose under corresponding provisions of the Revenue Act of 1921, previously cited herein for other purposes.[8] In all of these cases, although only certain parts of the property involved were physically damaged or injured, the amount of loss was based on the damage to the *property as a whole*.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MARQUETTE, STERNHAGEN, AND ARUNDELL dissent.

---

[7] *Barnett* v. *St. Anthony Falls Water Power Co.*, 33 Minn. 265; 22 N.W. 535, *Nelson* v. *Village of West Duluth*, 55 Minn. 497; 57 N.W. 149; *Fessum* v. *Chicago St. P. Ry. Co.*, 80 Minn. 9; 82 N.W. 979; *Cooper* v. *New York S. & W. Ry. Co.*, 122 App. Div. 128; 106 N.Y.S. 611; *Harvey* v. *Sanitary Dist. of Chicago*, 260 Ill. 54; 102 N.E. 1070.

[8] *Whipple* v. *United States* (U.S. Dist. Ct., Dist. of Mass.), 25 Fed. (2d) 519; *Frederick Nash*, 22 B.T.A. 482; *John S. Hall et al., Executors*, 16 B.T.A. 71; and *Mary Cheney Davis*, 16 B.T.A. 65.