Robert H. Montgomery v. Commissioner.
Robert H. Montgomery v. Commissioner
Docket No. 735.
United States Tax Court
1947 Tax Ct. Memo LEXIS 320; 6 T.C.M. (CCH) 77; T.C.M. (RIA) 47017; January 31, 1947
*320 J. Marvin Haynes, Esq., 1 E. 44th St., New York, N. Y., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax of $8,448.02 for the year 1940. The petitioner claimed a loss due to casualty in the amount of $13,500 in his 1940 return. The respondent allowed a deduction in the amount of $1,500 and disallowed the balance, $12,000. The petitioner asserts error in this respect, now claiming that he sustained a loss of $25,000 and that his taxes for 1940 have been overpaid to the extent of $8,093.46. Findings of Fact The petitioner is an attorney and a certified public accountant, having engaged in the practice of law and accounting for more than 50 years. His principal office is in New York and he filed his 1940 return in the third district of New York. In the summer of 1931 petitioner became interested in collecting and growing palm trees and other tropical trees and plants. In that connection he consulted with officials of the Department of Agriculture at Washington to ascertain whether land in the vicinity of Coral Gables, Florida, would be suitable for the purpose of *321 conducting an experiment by acquiring and growing rare and tender tropical palms and other plants. Some officials were interested in the project and encouraged and advised petitioner as to the required soil and location. Petitioner went to Coral Gables, Florida, and upon locating an area containing the suggested soil, he purchased, in 1932, for $10,000 seventy acres, consisting of 20 acres of low hammock land at $250 an acre and 50 acres of cut under pine land at $100 an acre. Between 1932 and 1935, inclusive, petitioner spent approximately $63,000 for the construction of a main house, or the residence of petitioner (costing about $15,000), a superintendent's house, a tool house, a greenhouse (about 20 X 50 feet), a slat house (about 60 X 90 feet), a small guest house, and a swimming pool. The palm collection was started in the summer of 1932. Petitioner and the head of the United States Plant Introduction Garden motored through Florida for a week or ten days looking for rare palms which had been brought in from other countries before quarantine was established. The depression prevailing at that time made it easy for petitioner to obtain many of the rare palms already in Florida. *322 Because of the quarantine, importation of growing palms was impossible. In this situation petitioner, in order to raise new species, brought in seeds through the help of the United States Department of Agriculture, Dr. David Fairchild, Principal Agricultural Explorer of that Department, Dr. E. D. Merrill, Administrator of Botanical Collections of Harvard University and Director of the Arnold Arboretum, and Dr. Thomas Barbour, Director of the Museum of Comparative Zoology, Harvard University, and Custodian, Harvard Biological Establishment, Soledad, Cuba. Using a letter head entitled "The Coconut Grove Palmetum, Coconut Grove, Florida," which also listed the above three scientists as an advisory board and petitioner as director, petitioner communicated with every tropical garden in the world in an effort to obtain seeds of new species by an exchange of seeds from Florida for seeds from other countries, in which the various botanical gardens were not allowed to sell seeds but were willing to exchange. In a comparatively short time petitioner acquired over 2,000 lots of seed. The seed was planted in the greenhouse and plants were grown in the slat house. It was necessary to acquire soil *323 sterilizing apparatus and other equipment to induce seed not only to sprout but to grow to a point where the plants could be set out. A water system was built covering fully 40 acres as the plants required watering for about two years after being set out. In 1932 the petitioner had about 30 men working on the estate. Thereafter the number decreased and from 1934 up to the time of the freeze in 1940, six or seven men were regularly employed with some occasional extra help. During 1932, 1933 and 1934 the cost of plants, grading, landscaping and planting amounted to a total of approximately $80,000. This included taking about 12,000 cubic yards of soil from the low land to the high land for planting purposes. The seed acquired by the petitioner cost no more than $100, as most of it was acquired in exchange. No segregation of the cost of developing and growing of plants, and the cost of the improvement of the land was made. After the first three years petitioner spent about $10,000 a year, most of which was spent for upkeep and maintenance and not considered as a capital expenditure by him. By 1934 the estate was well landscaped and was one of the show places in Dade County. It had the *324 appearance of age as well as beauty. By December 1939 petitioner had acquired 432 different species of growing palms, including some unidentified species and varieties. He also had 1,011 different species of trees, plants, shrubbery and vines growing by that time, including 50 of cycads, 130 of flowering trees, 199 of foliage and other trees, 397 of succulents, 77 of vines, 110 of tropical fruits, including cultivated varieties, 101 citrus, including cultivated varieties, and 37 of native trees in the hammock. This composed the largest collection of growing palms and other tropical plants in Florida, if not the world. There were many thousands of trees and plants growing on the estate. On January 27, 1940 the weather in Florida turned cold and by nine o'clock in the evening was below freezing and remained so until eleven o'clock of the morning of January 28, 1940, the temperature going as low as 24 degrees. Immediately after the freeze petitioner instructed his superintendent to prepare an inventory of the plants which had been destroyed or damaged by the freeze. A summary of the inventory prepared by the superintendent is as follows: Number of Value Estimated
Destroyed
Plants
Species
Before and After
Cost of
Nursery Stock: Freeze Restoration
Trees and shrubs (in pots or boxes)
128
19
$ 122.80 *
Palms (4 to 10 inches)
254
23
402.00 *
In open ground: Palms (4 to 20 feet)
74
25
1,452.50 *
Damaged
Nursery stock
164
15
382.50
$ 135.00
$ 140.00 *
In open ground: Palms (4 to 35 feet)
465
15
22,385.00
13,760.00
4,197.00 *
Palms (3 to 25 feet)
163
19
5,375.00
2,753.00
1,261.00 *
Shrubs and trees Ranging from
211
21
6,259.00
2,227.00
2,068.00 *
Shrubs and trees 3 to 30 feet
84
26
1,102.00
393.50
402.00 *
Shrubs and trees in height
38
7
520.00
210.00
157.00 *
Vines
43
6
695.00
371.00
195.00 *
and others
Mangoes
53
5,875.00
4,300.00
815.00 *
Loss of fruit estimated on previous years
crops
600.00 *
Avocadoes
11
425.00
225.00
115.00 *
Loss of fruit estimated on previous years
crops
$ 50.00 *
Bananas, 40 clumps
$ 200.00
$ 100.00
50.00 *
Litchiis, 6 dead
4.00
24.00 *
Pineapples, estimated loss, part crop
50.00 *
Papayas, loss of 800 lbs. of fruit
40.00 *
Hawaiian Hibiscus, 33 grafts dead
330.00 *
Hawaiian Hibiscus, 60 grafts damaged
600.00
400.00
100.00 *
Poinsettias
12
120.00
20.00
12.00 *
Ixora Macrothyrsa
15
45.00
15.00
20.00 *
Four acres lawn
1,000.00
500.00
200.00 *
Loss of vegetables
200.00 *
Loss of cut flowers
300.00 *
Loss of other decorative trees
2,000.00
Labor, for pruning, etc.
200.00
$49,664.80
$25,409.50
$10,826.00
25,409.50
Difference in value before and after freeze
$24,255.30
*325 Subsequent to the taking of the above inventory some of the plants listed among the damaged plants died, had to be dug up and were destroyed. Some of the other plants cut to the ground in the hope of saving them merely produced suckers and as a result are not worth ten per cent of a good plant. On some palms the effect of the freeze was not apparent until two or three weeks thereafter. The damaged plants required considerable care, such as pruning, the bringing in of fresh soil from the low land, fertilizing and watering, - items which the superintendent included in his estimate of restoration cost. Petitioner has not been compensated in whole or in part by insurance or otherwise for the loss resulting from the freeze. The Florida estate is the residence of petitioner and is not connected with any trade or business. No part of the cost for the planting, the land, or the buildings on the estate has been deducted as expense items in any return filed by the petitioner. Since the petitioner acquired the estate in 1932 and up to 1940 he has claimed no other casualty loss except in his return for 1935, in which he deducted a loss of $4,103 *326 sustained as the result of two hurricanes. The petitioner deducted as a loss not compensated for by insurance or otherwise, the amount of $13,500 in his 1940 return, which figure represented the stated value of the plants totally destroyed and the total amount of estimated restoration cost, as shown in the inventory made by the superintendent. The respondent allowed $1,500 and disallowed the balance. Within the time prescribed by law the petitioner filed a claim for refund of taxes of $8,093.46 in which he claimed that he had sustained in 1940 a loss from the freeze in an amount of at least $25,000, instead of $13,500, the amount deducted in his return. As a result of the freeze the value of petitioner's estate immediately after the freeze was $13,500 less than its value immediately before the freeze. Opinion VAN FOSSAN, Judge: The Commissioner does not contend that the petitioner, under section 23(e), Internal Revenue Code, [1] did not sustain any loss as a result of the freeze. On the contrary, he determined that the petitioner sustained a loss in 1940 "as a result of damage to plants and trees on your property at Coconut Grove, Florida, arising from a freeze." However, he reduced *327 the claimed amount of loss from $13,500 by $12,000, thus allowing as a casualty loss deduction the amount of $1,500 only. The petitioner now claims that he sustained a casualty loss of $25,000. Hence, the only question to be determined is the amount of the loss sustained, which is a question of fact. The amount of the loss sustained is the difference between the value of the estate immediately preceding the casualty and the value after the casualty, limited however to the amount of the adjusted basis of the estate. Helvering v. Owens, 305 U.S. 468; Whipple v. United States, 25 Fed. (2d) 520; *328 Ray Durden, 3 T.C. 1; John S. Hall, et al., Executors, 16 B.T.A. 71; Mary Cheney Davis, 16 B.T.A. 65; G.C.M. 21013, 1939-1, C.B. 101. It has been held under similar circumstances in determining loss due to casualty, trees and shrubbery destroyed should be treated as an integral part of the estate. Whipple v. United States, supra; Frederick H. Nash, 22 B.T.A. 482; John S. Hall, et al., Executors, supra; Mary Cheney Davis, supra.See also Harry Johnston Grant, 30 B.T.A. 1028. The testimony as to the loss is quite extensive and widely at variance. Petitioner's superintendent made an estimate of the damage immediately after the freeze in the amount of $13,500, using as a gauge the estimated cost of restoring, repairing or replacing the damaged plants and trees. This is the amount claimed by the petitioner in his return. One of the petitioner's witnesses estimated the value of the estate before and after the freeze at $150,000 and $125,000, respectively, with a consequent loss figure of $25,000. Witnesses for the respondent were of the opinion that the value of the entire estate was $75,000 and $70,000 before and after the freeze, respectively, with a consequent loss of $5,000. *329 We are satisfied that petitioner's expert witnesses gave too great an emphasis to what might be termed the intangible elements involved in petitioner's pioneering project while respondent's witnesses, on the other hand, were too coldly realistic. In our judgment the correct figure lies somewhere between the two extremes. We have found that the value of petitioner's property after the freeze was $13,500 less than immediately before the freeze. This amount is less than petitioner's adjusted cost basis and was not compensated for by insurance or otherwise. The estate is a private residence not used for business purposes, no part of the cost of which has been deducted in the petitioner's tax returns. Consequently, the petitioner is entitled to a total loss deduction in the amount of $13,500. The above figure coincides with the amount originally claimed by petitioner in his return and with the amount of damage estimated by the petitioner's superintendent immediately after the freeze. It is not found for these reasons but represents our judgment based on the entire record of the nearest possible approximate estimate to a correct figure. Decision will be entered for the petitioner. Footnotes
*. Items included in deduction claimed in 1940 return.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.↩