Harold B. Adams v. Commissioner.
Adams v. Commissioner
Docket Nos. 35451, 38239.
United States Tax Court
1953 Tax Ct. Memo LEXIS 99; 12 T.C.M. (CCH) 1103; T.C.M. (RIA) 53321; September 30, 1953
Lancie L. Watts, Esq., 801 Scarritt Building, Kansas City, Mo., Charles C. Shafer, Jr., Esq., and John S. Newhouse, Esq., for the petitioner. Melvin A. Bruck, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings were consolidated for hearing and involve deficiencies and penalties as follows: Docket No. 35451
1946
1947
1948
1949
Gift
Tax
$5,401.27
$ 5,129.18
$2,735.72
$1,672.36
Penalty
1,350.32
1,282.30
683.93
418.09
Docket No. 38239
Income
Tax
$5,247.14
$14,267.51
$5,541.28
$ 663.48
*100 The issues are (1) whether certain payments made to a trust are taxable to petitioner; (2) whether the payments under (1) represent taxable gifts of petitioner; (3) the amount of gifts made by petitioner prior to 1946; (4) liability of petitioner for penalties for falure to file gift tax returns; and (5) whether petitioner is entitled to a deduction of $8,500 in 1947 for a fire loss. Findings of Fact The petitioner, a resident of La Russell, Missouri, filed his income tax returns for 1946 and 1947 with the collector of internal revenue for the district of Kansas and for 1948 and 1949 with the collector for the sixth district of Missouri. He did not file a gift tax return for any of the taxable years. Petitioner, born in 1906, had a net worth of about $40,000 in 1929. In 1935 he was adjudicated a bankrupt. During the early part of 1944 petitioner commenced to engage in the marketing of a power driven post hole digger being sold under the name of "The Farmer's Friend". In March 1944 petitioner acquired all of the rights to produce the machine. Thereafter he redesigned the machine and in April 1944 sold the diggers as the sole proprietor of Adams Equipment Company. In June 1944 *101 petitioner filed an application for letters patent on the redesigned machine, which, for convenience, will be referred to hereinafter as the first application. The diggers were manufactured by the Darby Manufacturing Company on order of petitioner in accordance with a contract entered into in May 1944. Production under the agreement terminated the early part of 1945. Petitioner changed the name of the digger to "Easy Way" the latter part of 1944. The name was used in circular mailed by petitioner to about 10,000 implement dealers throughout the United States. He sold about 1,100 units during the life of the production contract with the Darby Manufacturing Company. In January 1945 another application for letters patent on the machine was filed, which will be referred to hereinafter as the second application. The application included changes in the design of the first application. Neither application was for a basic invention. In May 1945 petitioner entered into an agreement with the Standard Steel Works, hereinafter referred to as Standard, to manufacture the machine in accordance with the design supplied by petitioner. The first machines were delivered by Standard in September *102 1945. On September 28, 1945, petitioner made an irrevocable assignment in trust to Noel Kirby of an undivided one-half interest in the first and second applications. The trustee was directed to accumulate the income of the trust until the beneficiary thereof, George Curtis Adams, the ten-year old adopted son of petitioner, attained 21 years of age, when all of the assets of the trust estate were to be distributed to him. The assignment was recorded in the United States Patent Office. Prior to the execution of the trust instrument petitioner endeavored to sell or license to Standard and others his rights under the applications for patents. On September 29, 1945, the trustee executed an instrument giving petitioner the exclusive right to manufacture and sell machines under the applications for patents, in consideration of which petitioner agreed to pay to the trustee one-half of the annual net profits, reduced by $12,000, except that for 1945 the reduction was to be $4,000. The agreement was subject to cancellation by either party at any time after January 1, 1946, on giving three months' notice in writing. Pursuant to the arrangement petitioner paid to the trustee in 1946 for profits *103 to May 29, 1946, the amount of $18,157.87. The payment was claimed as a deduction in a return filed by petitioner and was not disallowed by the respondent. On May 29, 1946, the petitioner and the trustee granted to Standard for a period of 10 years the exclusive right to produce and sell machines described in the first and second applications for patents at certain specified royalties. The royalties were payable under the contract after any denial of the applications for patents, or either of them. The royalties were payable in equal amounts to petitioner and the trustee. The Adams Equipment Company discontinued business when the licensing agreement was entered into with Standard. When the licensing agreement was entered into with Standard the name "Easy Way" was established and Standard advertised and marketed the digger under that name. During the years 1946, 1947, 1948 and 1949 Standard spent $6,000, $8,000, $12,000 [1] and $24,000, respectively, advertising the "Easy Way" post hole digger. Standard paid the following royalties to the trustee pursuant to the terms of the agreement of May 29, 1946: 1946
$12,847.79
1947
22,796.33
1948
12,158.76
1949
7,432.70
*104 These amounts, and the amounts received from petitioner in 1946 under the agreement of September 29, 1945, were reported by the trustee as taxable income of the trust. On August 12, 1946, petitioner filed an application for letters patent on a post hole digger, hereinafter referred to as the third application. In 1948 the trustee paid one-half of a charge of $440 made by a patent attorney for services performed in connection with the application. The claims made under the first application were rejected on June 20, 1945, by the United States Patent Office and the application was abandoned on December 21, 1945. The United States Patent Office rejected on June 21, 1946, the claims made in the second application and "finally" rejected them on August 30, 1949, after which it refused to enter amendments to the application. The second application was abandoned on February 28, 1950. A patent was issued to petitioner on April 26, 1949, on the third application. The only difference in the elements of the first and second applications and the third application *105 was in the mounting of the torque bar. The third application was essentially a combination of the better elements of the first two. No assignment was made by petitioner to the trustee of his rights under the third application, or in the patent issued to him thereunder. Other than changes in sizes of bolts and braces, Standard made no change in the structure of the post hole digger it produced after May 29, 1946, under the licensing agreement it entered into with petitioner and the trustee. Excepting bolts and braces, all parts were at all times interchangeable. After the issuance of a patent on the third application, Standard demanded that a new contract be entered into to cover it. Petitioner first declined to comply with the demand, based upon the theory that it did not need the protection, but later agreed to do so under a threat of Standard to start production of a digger that would circumvent the patent. On March 30, 1950, petitioner granted to Standard the exclusive right to use the patent and the trade name "Easy Way" for the remainder of the life of the patent, or to April 26, 1966, in consideration of the payment to him of certain specified royalties on all units and *106 parts manufactured and sold. At that time the agreement of May 29, 1946, was terminated and since then all royalties have been paid to petitioner under the agreement of March 30, 1950. Petitioner filed a gift tax return for 1945 in which he reported at a value of $5,000, less an exclusion of $3,000, his transfer of a one-half interest in the first and second applications for patents. No gift tax liability was ever asserted against petitioner on account of the gift he reported. In January 1950 the respondent determined transferee liability in the amount of $19,575 against the trustee on account of the gift reported by petitioner. The liability was based upon a valuation of $120,000 and a specific exemption of $2,000. No allowance was made for an exclusion upon the ground that the gift was of a future interest in property. The trustee contested the determination in a petition filed with this Court. Thereafter, pursuant to a stipulation of the parties, a decision was entered that the trustee was not liable as such or as a transferee on account of the gift. Amounts received by the trustee during the taxable years were regarded by respondent as taxable income to petitioner and as gifts *107 to the trust of a future interest in property, against which no exclusion was allowable. Pursuant to such determination the respondent determined gift tax liability against petitioner each taxable year, and a 25 per cent penalty under section 3612(a) (1), I.R.C., for failure to file returns within the time prescribed by law. The gift tax liabilities determined were based, in part, upon a valuation of $120,000 on the one-half interest in the first and second applications, less a specific exemption of $2,000. On January 1, 1947, petitioner took possession of a farm which he had purchased in October 1946 at a cost of $27,000. The farm consisted of 425 acres of land, improved by a frame house in good condition and a number of outbuildings, including four old frame barns, an old house for hired help, and a smoke house. Petitioner and one King conducted farming operations on the property in 1947. The main house, which contained ten rooms, including a bath and a half, and was wired for electricity, was completely destroyed by fire on January 4, 1947. Its cost to petitioner was $5,000. Petitioner recovered $1,500 insurance for loss of the property. In his return *108 for 1947 petitioner claimed a deduction of $8,500 for loss of the house. The respondent disallowed the deduction for lack of proof. Opinion The primary issue relating to the deficiencies in income tax is whether the amounts received each taxable year by the trustee from Standard for royalties payable under the agreement of May 29, 1946, constitute income taxable to petitioner, as determined by the respondent, or to the trust, as contended by petitioner. The petitioner contends in general that he made an irrevocable completed gift of a one-half interest in the first and second applications to the trust and that any income derived from the use of the property so assigned is taxable to the assignee. The respondent concedes that rights in applications for patents constitute property subject to transfer. But, he argues that the diggers produced by Standard were of the design covered by the third application, in which the trustee had no interest, and, accordingly, the property which produced the income in question was owned exclusively by petitioner. Respondent contends as an additional ground for sustaining his determination that the petitioner, as owner of the third application, *109 could have eliminated the royalty payments to the trustee by entering into a new contract with Standard to conform to actual production. We find no factual basis for the primary contention of respondent. Standard commenced the production of post hole diggers under a contract entered into with petitioner on May 14, 1945. At that time the first and second applications were pending before the Patent Office. The first application was abandoned on December 21, 1945. The final rejection of the second application did not occur until August 30, 1949, and it was not abandoned until February 28, 1950. On May 29, 1946, after the first application had been abandoned and while the second application was pending, the trustee, who became the owner of an undivided one-half interest in the first two applications under a gift made on September 29, 1945, and petitioner entered into an agreement with Standard for the production and sale, on a royalty basis, of diggers described in the two applications. The third application was not filed until August 12, 1946, and, therefore, was not in existence for inclusion in the agreement. The fact that the first application had been abandoned before the agreement *110 was entered into on May 29, 1946, with Standard is not significant in view of the agreement that the specified royalties were payable on diggers manufactured under the descriptions set forth in the applications and sold. Thus, the royalties agreed upon were payable so long as the device, as described in the applications, was manufactured and sold by Standard. The diggers produced by Standard at all times important after May 29, 1946, were from the designs described in the first and second applications, with the minor exception of changes made in the size of bolts and braces. The clear intent of the contracting parties was that the royalties were payable so long as production of the device was from the plan described in the applications and regardless of the outcome of the applications in the Patent Office. Petitioner did not consider it necessary to amend the royalty contract to cover the third application in view of the fact that the device described therein was basically the same as the one covered by the two prior applications. The soundness of his conclusion is supported by testimony of the patent attorney who represented the petitioner before the Patent Office, and the patent *111 attorney in the employ of Standard who assisted him draft the claims allowed by the Patent Office in granting a patent on the third application. Other testimony is to the effect that the third application was merely a combination of the better elements of the first and second applications. Respondent contends that petitioner can not avoid the imposition of the tax by merely showing a transfer of the interest in property that produced the disputed income. He says that under Commissioner v. Sunnen, 333 U.S. 591, it would be reasonable to treat petitioner as the recipient of the income in view of his alleged power to alter the royalty contract by substituting the third application for the first and second applications, a change accomplished in 1950 by a new contract. Any such arrangement would have required the consent of Standard and no suggestion is made that petitioner had any dominion or control over its corporate affairs. The arrangement continued without any known suggestion of alteration until a patent was issued on the third application when Standard demanded that the current agreement be cancelled and another one entered into for the production and sale of diggers *112 under the patent. Petitioner first refused to comply with the request but later, under a threat of Standard to manufacture diggers of a different design, consented to the demand. Thus the substitution of the patent for the first and second applications flowed from an ultimatum of Standard and was made contrary to the wishes of petitioner. At that time the first two applications had been abandoned. Obviously, the control here was vested in Standard, and not in the petitioner. A further contention of respondent on brief is that the payment of $18,157.87 to the trustee by petitioner in 1946 under the contract of September 29, 1945, for diggers produced to May 29, 1946, should be taxed to petitioner for income and gift tax purposes. His ground for asserting that the amount constitutes income of petitioner is the same as the one advanced for the payments made by Standard, i.e., that the diggers were produced from the design described in the third application for a patent. As already pointed out, the trustee had no interest in the third application. The application was not filed until August 12, 1946, and the diggers for which the payments were made were produced under the first and second *113 applications for patents. We conclude that the payments do not constitute income taxable to petitioner, they having been made for the property interest the trustee had in the first and second applications. In view of the conclusion reached on the income question, it follows that there is no liability for gift taxes and that there is no addition to gift tax for failure to file gift tax returns. The loss on account fire claimed by petitioner is deductible under section 23(e). The issue with regard to this loss is the amount in which it is properly allowable. The farm was acquired in October 1946 at a cost of $27,000 and possession was taken by petitioner four days before the fire occurred. Petitioner arrived at the amount of the fire loss of $10,000 claimed in his return, less $1,500 for insurance, by allocating $12,500 to the improvements, of which amount he arbitrarily allocated $2,500 to the barns and the hired man's house. The remainder of $14,500 of the total cost was allocated to the land at the rate of about $20 per acre for 295 acres of pasture land, and $60 or $65 per acre for the remaining 130 acres, which was bottom land. Petitioner's theory is that the amount of *114 his loss is measured by the difference between the value of the farm before and after the fire. Section 23(i) provides that the basis for loss is the adjusted basis provided in section 113(b) for determining loss from sale or other disposition of property. Section 113(b) provides for a basis of cost, adjusted as thereinafter provided, none of which adjustments is contended by the parties to be material. Here the main house was totally destroyed. The basis for the loss is cost. Harry Johnston Grant, 30 B.T.A. 1028. See Helvering v. Owens, 305 U.S. 468. There is no evidence that the parties to the sale in October 1946 agreed upon a price for the residence as part of the total amount of $27,000. Petitioner testified that the residence had a reasonable value of $1,000, and his witness on the point, a real estate agent, reached a value of $11,650 by deducting from the purchase price the amount of $13,700 for the land and $1,650 for improvements other than the residence. Petitioner's witness valued the pasture land at $20 an acre and the bottom land at $60 an acre. Other evidence discloses that their valuations are excessive. The four section lots comprising *115 the farm, including the residence destroyed by fire and other improvements, were assessed in 1947 for state and county taxes on the basis of a total value of $8,880, or about one-third of actual cost to petitioner. There were no improvements on at least two of the four lots, one of which, consisting of 80 acres, was valued for tax purposes at $20 an acre and the other of like acreage was valued at $16.25 an acre. The other lots of 215 and 50 acres were valued at about $19 and $37.60 an acre, respectively. It it apparent that petitioner and his witness undervalued the 295 acres of pasture land to reach the value each placed on the residence. Furthermore, the insurance carried on the residence indicates a value considerably less than the amount being claimed. The respondent made no determination on the cost of the residence. The size of the building and its condition disclose a value, as part of the cost of the farm, in excess of $1,500, the amount of insurance recovered. Considering all of the evidence we conclude that $5,000 is a reasonable amount to allocate as petitioner's cost of the residence. The loss will be recomputed on that cost basis. Decisions will be entered under Rule *116 50. Footnotes
1. Petitioner and the trustee agreed to contribute to the cost an amount equal to 50 cents per unit sold, with a maximum of $4,000.↩